IN RE TRUST CREATED BY HAROLD INMAN, DECEASED.
ROBERT H. BRACKETT, TRUSTEE OF THE HAROLD INMAN
REVOCABLE TRUST, APPELLANT, V. MARYANN TREMAINE
ET AL., APPELLEES.

693 N.W.2d 514

Filed February 25, 2005.    No. S-03-1183.

Kenneth W. Pickens and Luke H. Paladino, Senior Certified Law Student, of Pickens, Green & Gleason, L.L.P., for appellant.

Monte Taylor, of Taylor, Peters & Drews, for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Robert H. Brackett, as trustee of a revocable trust created by his grandfather, Harold Inman, now deceased, petitioned the county court for Douglas County for authority to sell certain real property held by the trust to himself. After an evidentiary hearing at which several beneficiaries of the trust appeared in opposition to the proposed sale, the court denied Brackett's petition. He perfected this timely appeal, which we moved to our docket on our own motion pursuant to our authority to regulate the caseloads of the appellate courts of this state. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## FACTS

Inman, as settlor, executed a revocable trust agreement dated March 9, 1994, naming himself as the initial trustee. The beneficiaries of the trust included Inman's two daughters and seven

grandchildren, including Brackett, who was also named as successor trustee. Brackett became the trustee upon Inman's death and had served in that capacity for approximately 7 years as of the hearing held in this matter in August 2003.

The trust instrument directed that certain assets be distributed from the trust to various beneficiaries upon Inman's death. Those assets are not involved in this appeal. The trust assets also included approximately 189 acres of farmland located in Washington County, Nebraska. The trust instrument directed that Elizabeth Peters, one of Inman's surviving daughters, was to receive rental income from 55 acres of this land during her lifetime and that upon her death, Brackett was to receive the income during his lifetime. The trust instrument further provided that Brackett was to receive income from the remainder of the farmland and that upon his death, it was to be divided among the other beneficiaries or their issue.

Brackett executed a real estate purchase agreement dated September 30, 2002, whereby he agreed to purchase from "Robert Brackett as Trustee of the Inman Living Trust" a portion of the Washington County land held by the trust, consisting of 42 acres, of which 30 were tillable. On April 14, 2003, Brackett registered the trust in the county court for Douglas County and petitioned the court to approve the proposed sale of the 42-acre tract. All nine beneficiaries of the trust, including Brackett, were listed in the petition as interested parties. Brackett alleged in his verified petition that he had purchased a home and moved it "onto the real property he proposes to sale [sic] to himself." He further alleged that if the court approved the sale at a price of $84,000, a reasonable rate of return on the proceeds would exceed the income being generated by the subject property. Five of the beneficiaries thereafter filed a written objection to the proposed sale on grounds that it "serves no one's interest but the Trustee's, reduces the value of the residuary estate and amounts to a calloused disregard of the Trustee's fiduciary obligation to protect the interests of the trust beneficiaries."

An evidentiary hearing on the proposed sale was held on August 15, 2003. Brackett testified that the only assets held by the trust at that time were the 189 acres of Washington County farmland, which included the 42 acres he proposed to sell, and $300 in

cash. The 30-acre tillable portion of the 42-acre parcel was rented on a cash basis and generated income of $64 per acre, totaling $1,920. Bracket testified that the proposed purchase price of $84,000 was based upon an appraised value of $2,000 per acre. Frederick Wohlenhaus, a licensed real estate appraiser, testified that he appraised the 189-acre tract in the fall of 1999, in March 2002, and in early August 2003. He also examined the 42-acre parcel which was the subject of the proposed sale. Wohlenhaus concluded that the highest and best use of the land was agricultural and that the fair market value of the 42-acre parcel was $2,000 per acre.

Brackett testified that he purchased an old farmhouse at auction and moved it onto the 42-acre parcel in June 2002, prior to seeking court approval of the sale. He further acknowledged that as a condition of the proposed sale, he would grant a permanent easement for ingress and egress to the remaining property which is located generally northeast and southwest of the 42 acres. Brackett believed, but was not certain, that the rate of return on the farmland was approximately 2½ percent, based upon its appraised value. Although he professed no experience in investing, he believed that the proceeds from the sale of the land could be invested to earn a greater return. He testified that if the sale were authorized, he would employ a broker to invest the proceeds, but indicated that further research would be necessary to determine the specific investments to be made. Brackett testified that he had previously attempted to sell the entire parcel of land held by the trust but received no offers.

Dr. David Volkman testified on behalf of Brackett as an expert in economics and finance. Volkman reviewed the trust instrument, the assets held and income earned by the trust, the Nebraska Uniform Prudent Investor Act, information from the National Council of Real Estate Investment Fiduciaries, equity returns from a database, and the appraisals prepared by Wohlenhaus. Based upon this information, Volkman opined that because the assets of the trust were not diversified, the standards of the Nebraska Uniform Prudent Investor Act were not met. Volkman analyzed the diversification of the trust in relation to the return and risk of the investments and compared the rate of return on farmland as opposed to other types of investments. Asked to evaluate the risk associated with the trust assets as then held, Volkman stated:

> The greatest risk is that it's not diversified. It's invested all in one asset. And when you invest in one asset, you significantly increase the probability of not receiving the return that you would like to it. It would be similar if you went out and bought one stock and put all of your savings in one stock. There's a high probability you may not get the return that you want from that one stock.

Volkman further testified that farmland has a lower rate of return and higher risk for rate of return compared to the Dow Jones index, a higher rate of return and higher risk than treasury notes, and a significantly lower rate of return but also less risk than the NASDAQ Composite Index. He testified that the overall risk to the beneficiaries could be reduced by having a portion of the corpus invested in farmland and other portions in investments which would yield a higher rate of return.

Maryann Tremaine, Inman's other surviving daughter, testified as a spokesperson for the five beneficiaries who filed a written objection to the sale. She opposed the sale because of her belief that Inman intended the farmland to remain in trust for all of the beneficiaries and that it would increase in value over time. Another beneficiary who joined in the written objection testified that she opposed the sale for generally the same reasons. Two beneficiaries who did not file written objections also testified in opposition to the sale. Peters opposed the sale because she believed the property should remain "in the family" and was satisfied with the current income. One of Inman's granddaughters who is a beneficiary of the trust testified that she opposed the sale because "I truly believe my grandfather left the property for everybody to enjoy. It has sentimental value to the whole family, not just one person."

In its order denying Brackett authority to execute the proposed sale, the county court found that "seven of the nine trust beneficiaries oppose the sale; that there is no persuasive evidence that the proposed sale would enhance or protect the interests of the beneficiaries and that there is a likelihood that the sale would lessen the value of those interests."

## ASSIGNMENTS OF ERROR

Brackett assigns, combined and restated, that by denying him authority to sell the trust property to himself, the probate court (1)

failed to allow him to diversify the assets of the trust in compliance with the Nebraska Uniform Prudent Investor Act and (2) erroneously allowed principles against self-dealing to trump statutory law and trust provisions that authorized the requested sale.

## STANDARD OF REVIEW

In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. *In re Conservatorship of Hanson*, 268 Neb. 200, 682 N.W.2d 207 (2004); *In re Trust Created by Martin*, 266 Neb. 353, 664 N.W.2d 923 (2003). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Conservatorship of Hanson, supra*; *In re Loyal W. Sheen Family Trust*, 263 Neb. 477, 640 N.W.2d 653 (2002). Competent evidence is evidence which is admissible and tends to establish a fact in issue. *Mathes v. City of Omaha*, 254 Neb. 269, 576 N.W.2d 181 (1998).

## ANALYSIS

The Nebraska Uniform Trust Code (NUTC) was enacted in 2003 and became operative on January 1, 2005, during the pendency of this judicial proceeding. See Neb. Rev. Stat. §§ 30-3801 to 30-38,110 (Cum. Supp. 2004). Although not briefed or argued by the parties, this operative date has significance in this case because the NUTC applies to certain preexisting trust relationships. § 30-38,110. See, generally, John M. Gradwohl and William H. Lyons, *Constitutional and Other Issues in the Application of the Nebraska Uniform Trust Code to Preexisting Trusts*, 82 Neb. L. Rev. 312 (2003). Specifically, § 30-38,110 provides in pertinent part:

(a) Except as otherwise provided in the Nebraska Uniform Trust Code, on January 1, 2005:

(1) the code applies to all trusts created before, on, or after January 1, 2005;

(2) the code applies to all judicial proceedings concerning trusts commenced on or after January 1, 2005;

(3) the code applies to judicial proceedings concerning trusts commenced before January 1, 2005, unless the court finds that application of a particular provision of the code would substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties, in which case the particular provision of the code does not apply and the superseded law applies; and

(4) an act done before January 1, 2005, is not affected by the code.

Under § 30-38,110(a)(1), the NUTC is generally applicable to all trusts in existence on January 1, 2005, subject to certain statutory and perhaps constitutional exceptions. See Gradwohl & Lyons, *supra.* Because this judicial proceeding was commenced prior to the operative date of the NUTC, § 30-38,110(3) requires us to apply the NUTC except in those instances where we determine that such application would "substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties," in which instance, we must apply prior law which has been superseded by the NUTC.

In his brief, Brackett argues that this action is governed by Neb. Rev. Stat. § 30-2822(2) (Reissue 1995), which provided in pertinent part: "Any sale or encumbrance to the trustee . . . is voidable by any trust beneficiary except one who has consented after fair disclosure, unless (a) the trust instrument provides otherwise; or (b) the transaction is approved by the court after notice to interested persons." This statute was repealed by the NUTC. 2003 Neb. Laws, L.B. 130 (operative date January 1, 2005). Under the corresponding provision of the NUTC, a transaction involving trust property entered into by the trustee for the trustee's own personal account

is voidable by a beneficiary affected by the transaction unless:

(1) the transaction was authorized by the terms of the trust;

(2) the transaction was approved by the court;

(3) the beneficiary did not commence a judicial proceeding within the time allowed by section 30-3894;

(4) the beneficiary consented to the trustee's conduct, ratified the transaction, or released the trustee in compliance with section 30-3898; or

(5) the transaction involves a contract entered into or claim acquired by the trustee before the person became or contemplated becoming trustee.

§ 30-3867(b). Both statutes authorize a transfer of trust assets by a trustee to the trustee's own account with court approval, and the only issue presented in this appeal is whether the county court erred in not approving Brackett's proposed sale of trust assets to himself. Because we perceive no prejudice to any party in analyzing this issue under the NUTC, we do so pursuant to § 30-38,110(a)(3).

Resolution of the issue prescribed by this appeal requires an examination of the relationship between two separate legal duties owed by a trustee to the beneficiaries of the trust. The first is the duty of loyalty, which is substantially the same under the NUTC and prior law. Under the NUTC, "[a] trustee shall administer the trust solely in the interests of the beneficiaries." § 30-3867(a). Likewise, under the former law, "[a] trustee shall invest and manage the trust assets solely in the interest of the beneficiaries." Neb. Rev. Stat. § 8-2206 (Reissue 1997). Similar substantive provisions of the Nebraska Uniform Prudent Investor Act, formerly codified at Neb. Rev. Stat. §§ 8-2202 to 8-2205 (Reissue 1997), are also now included in the NUTC at §§ 30-3883 to 30-3886. Accordingly, pursuant to § 30-38,110(a)(3), we shall refer to the provisions of the NUTC in discussing the trustee's duties of loyalty and compliance with the prudent investor rule.

The record reflects that Brackett has purely personal reasons for seeking to acquire the 42-acre parcel from the trust. Brackett, who described himself as one who invests, remodels, and sells real estate, testified that he moved the farmhouse which he had purchased at auction to the trust property because he had "nowhere else to put it." He further acknowledged that he sought more land than was necessary for a home site because "I wanted my kids to have a good sized piece of land. I've always worked the land when I was a kid there and played up there. And it has some sentimental value, and I wanted more of a farmstead for my kids to grow up on." Brackett argues, however, that the county

court should nevertheless have approved the sale because investment of the proceeds in something other than agricultural real estate would provide diversification of trust assets in a manner consistent with the prudent investor rule, thereby benefiting all the beneficiaries.

The prudent investor rule applicable to trustees is now codified at §§ 30-3883 to 30-3889. Included in that rule is the principle that a "trustee shall diversify the investments of the trust unless the trustee reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying." § 30-3885. On the record before us, we conclude that there was no absolute duty to diversify the trust assets which would compel court approval of the proposed sale. The prudent investor rule is a "default rule" which "may be expanded, restricted, eliminated, or otherwise altered by the provisions of a trust." § 30-3883(b). It is true, as Brackett argues, that the trust instrument in this case gave the trustee broad powers in dealing with trust assets, including the power "[t]o receive, hold, manage and care for the property held in trust," and "[t]o sell publicly or privately for cash or on time, property, real or personal, held in trust . . . ." However, the trust instrument also conferred upon the trustee the power

> [t]o retain any property, whether consisting of stocks, bonds, other securities, participations in common trust funds, or of any other type of personal property or of real property, taken over by it as a portion of the trust, *without regard to the proportion such property or property of a similar character so held may bear to the entire amount of the trust*, whether or not such property is of the class in which trustees generally are authorized to invest by law or rule of court; *intending thereby to authorize the Trustee to act in such manner as will be for the best interest of the trust beneficiaries*, giving due consideration to the preservation of principal and the amount and regularity of the income to be derived therefrom.

(Emphasis supplied.) With respect to assets originally placed in trust, this provision modifies the general duty to diversify by authorizing the trustee to retain nondiversified assets if retention would be in the best interests of the beneficiaries.

Furthermore, the trustee's statutory duty to diversify trust assets is subject to the general "prudent investor" standard of care which requires a trustee to consider various circumstances relevant to the trust or its beneficiaries in investing and managing trust assets. § 30-3884(c). These circumstances include "[a]n asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries." § 30-3884(c)(8). We agree with a commentator who has noted that a similar provision in the Nebraska Uniform Prudent Investor Act could be utilized as a basis for justifying "non-diversification" of a family farm or ranch held in trust in favor of retaining the asset "for future generations of the family." Ronald R. Volkmer, *The Latest Look in Nebraska Trust Law*, 31 Creighton L. Rev. 221, 246 (1997). Brackett's professed "sentimental" attachment to the farmland which has been in his family for many years is clearly shared by the other family members who are beneficiaries of the trust. Those who filed an objection or testified in opposition to the proposed sale expressed the view that excising a 42-acre parcel from the 189-acre farm would have a detrimental effect upon their special relationship with the asset without achieving any appreciable benefit.

Brackett does not argue that his duty to diversify is absolute, but relies upon *Love v. Fauquet*, 184 Neb. 250, 166 N.W.2d 742 (1969), to support his argument that because the power to sell is clearly vested in his discretion, the sale should be allowed unless there is a clear abuse of discretion by him and the remainder beneficiaries should not be allowed to abdicate or control the sale. In *Fauquet*, the settlor devised an 80-acre farm in trust for the support and maintenance of a life beneficiary. The trust permitted invasion of the corpus in order to accomplish its objective. After liquid assets of the trust became depleted, the trustee sold the farm at a fair price. The remainder beneficiaries sought to set aside the sale in order to preserve the trust corpus and restrict the life beneficiary and the trustee to the income from the land. This court affirmed the dismissal of the action, determining that there was no conflict of interest on the part of the trustee with respect to the sale and that under the terms of the trust, the risk of invasion of the trust principal to provide liquid assets for support of the life beneficiary fell on the remainder beneficiaries. The instant case is clearly distinguishable from *Fauquet*, in that none of

the beneficiaries are dependent upon the trust for support. Peters, the only income beneficiary other than Brackett, testified that she considered the income from the farm held in trust to be sufficient. Moreover, *Fauquet* involved a sale to a disinterested third party with the express consent of the income beneficiary.

Historically, the law has looked with disfavor upon a trustee selling trust assets to himself. See, e.g., *Lancaster County Bank v. Marshel*, 130 Neb. 141, 264 N.W. 470 (1936). While such transactions are not absolutely prohibited under current law, they are voidable by a beneficiary unless specifically authorized by the trust instrument, approved by a court, or consented to or ratified by the beneficiary. See § 30-3867(c). It logically follows that a court should not approve such a transaction over the objection of a beneficiary unless it can be clearly demonstrated that the transaction is consistent with the trustee's duty to administer the trust solely in the interests of the beneficiaries. See Restatement (Third) of Trusts § 170, comment *f.* at 196 (1992) (noting that "court will permit a trustee to purchase trust property only if in its opinion such purchase is for the best interest of the beneficiary"). We agree with the county court that the evidence in this case does not meet this test. Brackett presented no specific plan for investment of the proceeds from the proposed sale, and thus, any potential benefit to the beneficiaries in the nature of increased income without a corresponding increase in risk to the principal is speculative. There is no evidence that additional income is needed in order to carry out any specific purpose of the trust, and the beneficiaries have articulated a legitimate interest in maintaining the geographic integrity of the farm that has been in their family for many years.

We conclude that the judgment of the county court conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. Finding no error appearing on the record, we affirm.

AFFIRMED.