# IN THE COURT OF APPEALS OF TENNESSEE
## AT MEMPHIS
April 1, 2016 Session

## JOHN D. GLASS v. SUNTRUST BANK, ET AL.

**Direct Appeal from the Probate Court for Shelby County**
**No. D9423     Karen D. Webster, Judge**

---

**No. W2015-01603-COA-R3-CV – Filed May 4, 2016**

---

This appeal involves a trust. A beneficiary of the trust filed this lawsuit against the bank that served as trustee of the trust, alleging that the bank mismanaged the trust in various respects and violated several duties owed to the beneficiary. After a five-day bench trial, the trial court ruled in favor of the trustee-bank on all claims. The bank was awarded its attorney's fees and expenses. The beneficiary appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court Affirmed
and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Donald William Pemberton, Memphis, Tennessee, for the appellant, John D. Glass.

Olen M. Bailey, Jr., Memphis, Tennessee, for the appellee, SunTrust Bank; SunTrust Bank, Trustee of the Ann Haskins Whitson Glass Trust; and SunTrust Bank, Executor of the Estate of Ann Haskins Whitson Glass.

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

On April 12, 1994, Ann Haskins Whitson Glass ("Mrs. Glass") executed a trust instrument creating a revocable trust and designating herself as trustee of the trust. On that same date, Mrs. Glass also executed a limited durable power of attorney designating National Bank of Commerce, in Memphis, Tennessee, or its corporate successor, as her attorney-in-fact in the event of her disability or incapacity. On June 23, 2000, Mrs. Glass executed an amended trust agreement and a last will and testament. The amended trust agreement named National Bank of Commerce or its corporate successor as the successor

trustee of the trust in the event of Mrs. Glass's incapacity.  The last will and testament appointed National Bank of Commerce or its successor as the executor of Mrs. Glass's will.

In 2004, doctors determined that Mrs. Glass was incompetent to handle her affairs.  As a result, pursuant to the limited durable power of attorney and the amended trust agreement, the successor in interest to National Bank of Commerce, SunTrust Bank, became the attorney-in-fact for Mrs. Glass and the successor trustee of the trust.  Over the next several years, representatives of SunTrust met with Mrs. Glass on numerous occasions.  SunTrust paid Mrs. Glass's bills and signed her tax returns during that time.

Mrs. Glass died on January 2, 2007.  Days later, SunTrust submitted Mrs. Glass's will for probate administration.  The probate court admitted the will to probate and appointed SunTrust as the executor of the estate.

The trust became irrevocable upon the death of Mrs. Glass.  On the date of her death, the trust owned four assets: stock in SunTrust Bank, stock in First Tennessee Bank, stock in Security Bancorp of Tennessee, and a large farm in Dyer County.  These four assets had been owned by the trust for years.  They were purchased by either Mrs. Glass or her husband long before she became incapacitated.  The cumulative value of the four assets in the trust exceeded $2.5 million.  Mrs. Glass also personally owned some assets at the date of her death.  These included a checking account, jewelry, clothing, household furnishings, and similar items.  The total value of these items was around $27,000.

After all of the assets in the estate and the trust were distributed to the beneficiaries designated in the will and trust instrument, one of the two sons of Mrs. Glass, John D. Glass ("Plaintiff"), filed this lawsuit against SunTrust.  His complaint asserted claims for breach of trust, breach of fiduciary duties, mismanagement, negligence, and breach of the duty to diversify.  SunTrust asserted counter-claims for refunding of the expenses incurred in defending the litigation and for its attorney's fees.  After several years of litigation,[1] the trial court held a five-day bench trial in February 2015.  Expert witnesses testified for both sides.  On September 2, 2015, the trial court entered a lengthy final order, exceeding fifty pages, in which it ruled in favor of SunTrust on all of the claims asserted by Plaintiff.  However, this order expressly reserved any ruling on SunTrust's request for attorney's fees and expenses.  Plaintiff filed a notice of

---

[1] The case was originally filed in chancery court but was transferred to probate court.  The probate court dismissed the case twice on principles of res judicata and collateral estoppel due to a prior lawsuit involving Plaintiff and SunTrust.  We reversed the dismissals in *Glass v. SunTrust Bank*, No. W2010-02527-COA-R3-CV, 2011 WL 3793495 (Tenn. Ct. App. Aug. 26, 2011) and *Glass v. SunTrust Bank*, No. W2013-00404-COA-R3-CV, 2013 WL 4855400 (Tenn. Ct. App. Sept. 11, 2013).

appeal to this Court. On December 17, 2015, this Court entered a show cause order directing the appellant to either obtain the entry of a final appealable judgment or show cause why the appeal should not be dismissed. The trial court entered an amended final order on December 29, 2015, awarding SunTrust $202,468.71 in attorney's fees and expenses. This order resolved all issues and constitutes a final appealable judgment.

## II. ISSUES PRESENTED

The issues raised by Plaintiff on appeal involve the items owned by Mrs. Glass individually at the date of her death, the three stocks owned by the trust at the date of Mrs. Glass's death, the farm owned by the trust at Mrs. Glass's death, and the award of attorney's fees and expenses to SunTrust. Specifically, Plaintiff presents the following issues, which we have slightly restated, for review:

1. Whether SunTrust Bank was negligent as trustee in failing to exercise the power of attorney to transfer the remaining personally owned assets of Mrs. Glass to the trust prior to her death in order to avoid probate and the expenses in connection therewith;

2. Whether SunTrust Bank was negligent as trustee in failing to develop and implement a plan for diversification of the assets of the trust;

3. Whether SunTrust Bank was negligent as trustee in continuing a lease of the farm property in Dyer County; and

4. Whether SunTrust Bank asserted a valid counterclaim for refunding of expenses and/or for attorney's fees.

For the following reasons, we affirm the decision of the probate court and remand for further proceedings.[2]

## III. STANDARD OF REVIEW

A trial court's findings of fact from a bench trial are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *In re Estate of Ledford*, 419 S.W.3d 269, 277 (Tenn. Ct. App. 2013). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Watson v. Watson*,

---

[2]SunTrust, in its brief as appellee, listed 21 "sub-issues" for review within the context of the main issues listed above. We do not find it necessary to restate all of those sub-issues here, as they will be addressed where appropriate and necessary in the analysis below.

196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). Appellate courts afford trial courts considerable deference when reviewing issues that hinge on the credibility of witnesses because trial courts are "uniquely positioned to observe the demeanor and conduct of the witnesses." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). However, we review the trial court's resolution of legal questions de novo with no presumption of correctness. *1963 Jackson, Inc. v. De Vos*, 436 S.W.3d 278, 286 (Tenn. Ct. App. 2013). The interpretation of a trust agreement is a question of law for the court. *Holder v. First Tennessee Bank N.A. Memphis*, No. W1998-00890-COA-R3-CV, 2000 WL 349727, at *3 (Tenn. Ct. App. Mar. 31, 2000).

## IV. DISCUSSION

### A. *Avoidance of Probate*

The first issue we address is whether SunTrust breached a duty to Plaintiff by failing to convey all of Mrs. Glass's personal assets to the trust during her lifetime in order to avoid probate administration and the expenses incurred in connection therewith. The limited durable power of attorney executed by Mrs. Glass in 1994 specifically granted SunTrust the "power" to convey any property that she owned to the trust. Because Mrs. Glass was deemed incapacitated in 2004, and SunTrust acted as her attorney-in-fact thereafter, Plaintiff argues that SunTrust was negligent in failing to convey her non-trust assets to the trust it was administering, which resulted in unnecessary probate administration and related expenses. Plaintiff suggests that "one of the principal purposes of a revocable trust is the avoidance of probate." Plaintiff claims that SunTrust's inaction constituted a breach of trust and that he is entitled to recover $45,763.52 in unnecessary fees incurred during the probate proceeding.

A breach of trust is "[a] violation by a trustee of a duty the trustee owes to a beneficiary[.]" Tenn. Code Ann. § 35-15-1001(a). The initial burden to establish a breach of trust rests with the plaintiff. *Kennard v. AmSouth Bank*, No. M2007-00075-COA-R3-CV, 2008 WL 427260, at *2 (Tenn. Ct. App. Feb. 12, 2008). We examine the language of Mrs. Glass's will, the trust instrument, and the statute cited by Plaintiff on appeal to determine whether SunTrust had a duty to convey Mrs. Glass's assets to the trust and avoid probate administration.

Mrs. Glass's will required the trustee of the trust to pay all of the expenses "for the administration of my estate" in addition to taxes that might be "imposed upon my probate estate by reason of my death." Mrs. Glass's will devised her clothing to the Dyer County Union Mission and a gift of $2,000 to a companion. She left her personal effects and furniture to her two sons (Plaintiff John and William) outright and free of trust. Finally, Mrs. Glass devised the residue of her estate to the trust.

4

We now turn to the language of the trust instrument. It directed the trustee to honor and satisfy any pecuniary bequests made by Mrs. Glass in her will "if [her] probate estate [was] inadequate to provide for such bequests." After paying a charitable gift and Mrs. Glass's expenses and taxes, the trustee was directed to distribute the remainder of the trust assets, "including any distributions received from [her] probate estate under [her] Last Will and Testament, duly probated, or otherwise," one-half to John outright and one-half to a separate trust for William. The trust instrument allowed Mrs. Glass to impose additional terms and conditions on the administration of the trust "by any Last Will and Testament duly probated."

The language of these two instruments demonstrates that Mrs. Glass contemplated the probate administration of her will. Although several witnesses at trial agreed that one reason for establishing a revocable trust *can* be to avoid probate, the record does not contain any evidence to suggest that this was Mrs. Glass's intention. Mrs. Glass's will contained devises that were different than the distributions to be accomplished by the trust instrument. Mrs. Glass obviously knew how to convey assets to the trust when she desired to do so, yet she did not convey her individually owned assets to the trust during her lifetime or instruct anyone else to do so. Plaintiff testified that Mrs. Glass did not discuss her affairs with him prior to her death and said that she kept the trust and her will a secret from him.

We recognize that Plaintiff's expert testified that, as a trust officer, he would have transferred Mrs. Glass's personal assets to the trust prior to her death, and he believed that SunTrust was negligent in failing to do so. However, Plaintiff's expert also acknowledged that probate administration would have been necessary in any event, regardless of any conveyance of the personal assets, because the estate received a $40,000 tax refund from the Internal Revenue Service months after Mrs. Glass's death, and "it would have been necessary to institute a normal estate administration" in order to negotiate that refund check.[3] He conceded that probate administration was "inevitable" due to the refund check.

Plaintiff's expert also acknowledged Mrs. Glass's testamentary intent to bequeath her clothing to the Dyer County Union Mission and her personal effects to her sons outright and free of trust. He conceded that in order for these devises to be accomplished, those assets had to be included in Mrs. Glass's probate estate at her death. The trust instrument instructed the trustee to honor the *pecuniary* bequests set out in Mrs. Glass's will but failed to mention bequests of personal property. Plaintiff's expert agreed that SunTrust was carrying out the intent of Mrs. Glass as the testatrix by probating her will and accomplishing the devises set forth in her will.

---

[3]Plaintiff's expert testified that the maximum limitation for a small estate affidavit was $25,000 at the time, so this check exceeded that sum and made small estate administration unavailable.

5

In support of Plaintiff's argument on appeal, he cites Tennessee Code Annotated section 35-15-802(a), which provides that "[a] trustee shall administer the trust solely in the interest of the beneficiaries." Plaintiff's argument, as we understand it, is that SunTrust had a duty to avoid probate because doing so would be in Plaintiff's interest. However, under the Tennessee Uniform Trust Code, the phrase "[i]nterests of the beneficiaries" means "the beneficial interests provided in the terms of the trust." Tenn. Code Ann. § 35-15-103(17). Accordingly, "throughout the Tennessee Uniform Trust Code, whenever one encounters the phrase 'that a trust and its terms be for the benefit of its beneficiaries' (or a similar phrase), one should automatically add to such phrase . . . 'as the interests of such beneficiaries are defined under the terms of the trust.'" Tenn. Code Ann. § 35-15-105 cmt. As a result, the statute cited by Plaintiff requires a trustee to administer a trust solely in the interest of the beneficiaries as those interests are defined under the terms of the trust. In other words, the "interests of the beneficiaries" to which the trustee must be loyal are the beneficial interests as provided in the terms of the trust. Tenn. Code Ann. § 35-15-802 cmt. In the case before us, Plaintiff has not demonstrated that SunTrust administered the trust in a manner that was inconsistent with his beneficial interest as defined under the terms of the trust.

Even though SunTrust Bank had the *power* to convey Mrs. Glass's property to the trust, pursuant to the durable power of attorney, Plaintiff has not established that SunTrust had any *duty* to do so *as trustee* in an effort to avoid probate. As the comment to Tennessee Code Annotated section 35-15-815 explains,

> A power differs from a duty. A duty imposes an obligation or a mandatory prohibition. A power, on the other hand, is a discretion, the exercise of which is not obligatory. The existence of a power, however created or granted, does not speak to the question of whether it is prudent under the circumstances to exercise the power.

Tenn. Code Ann. § 35-15-815 cmt. Neither Plaintiff nor his expert pointed to any provision of the will, the trust instrument, or a statute that gave rise to a duty on the part of SunTrust as trustee to convey all of Mrs. Glass's personal assets to the trust prior to her death. It is one thing to suggest that avoiding probate would have been a wise move but quite another to say that SunTrust should be held liable for damages for failing to avoid probate in the absence of any instruction from decedent and when doing so would have defeated Mrs. Glass's testamentary intent.

The trial court found that SunTrust was not negligent in opening a probate proceeding but, rather, acted in good faith and as a prudent person would act, considering the purposes, terms, and other circumstances regarding the instruments executed by Mrs. Glass. We affirm the trial court's decision as to this issue.

## B.    *Diversification*

The next issue presented by Plaintiff involves the four assets that were owned by the trust when Mrs. Glass died.  As noted above, those assets were: stock in SunTrust Bank, stock in First Tennessee Bank, stock in Security Bancorp of Tennessee, and a large farm in Dyer County.  At the date of Mrs. Glass's death, the assets were valued as follows:

| | |
|---|---|
| 12,800 shares of SunTrust Bank, Inc. | $1,084,096 |
| 17,075 shares of First Horizon Nat'l Corp. (First Tennessee Bank) | $712,412 |
| 1,047 shares of Security Bancorp of Tennessee, Inc. | $275,152 |
| Farm in Dyer County | $510,292 |
| Total value at date of death | $2,581,952 |

Plaintiff argues that SunTrust should have sold at least some of the bank stock in either SunTrust Bank or First Tennessee Bank in order to diversify the trust's investments.[4]

A brief recap of the timeline is helpful at this point.  Mrs. Glass died on January 2, 2007.  The trust instrument required SunTrust to pay the expenses and taxes associated with the death of Mrs. Glass and the administration of her estate, then to pay a charitable gift to a certain recipient, then to distribute the residue of the trust assets one-half to Plaintiff outright and one-half to a trust for Plaintiff's brother.

On February 1, 2007, SunTrust sent a letter to Plaintiff that stated:

Re: Ann Glass Estate

Dear Mr. Glass

---

[4]Plaintiff does not argue that SunTrust should have sold the farm or the stock in Security Bancorp of Tennessee, as Security Bancorp of Tennessee was a closely held corporation associated with a small bank (originally Newbern State Bank).  Plaintiff concedes in his brief on appeal that "there was no market for this stock" and SunTrust "would have no way to market this stock even if they had developed a plan of diversification."  He also states that the farm "would have never been part of any asset pool which should have been diversified."  The Security Bancorp stock and the farm also *increased* in value after Mrs. Glass's death.

7

Please accept our sincere wishes of sympathy on the passing of your mom, Mrs. Ann Glass.

We would like to notify you that SunTrust Bank will serve in the capacity of Personal Representative for the above referenced Estate. You have been named as a beneficiary, and as such, are entitle[d] to a 50% share of the value of the assets of the Estate.

As a beneficiary of the above mentioned Estate you have the option of receiving your share of the assets in the form of a cash payment or in the form of in-kind securities. Should you choose a cash payment, you would not be assuming market risk related to the fluctuation in security values during the estate or trust settlement period. And as a result, once we receive all pertinent information, we intend to liquidate all securities and invest the proceeds in appropriate interest bearing investment grade fixed income securities (including money market) until such time as we are able to make a distribution.

However, if you choose to receive your distribution in the form of in-kind securities you will be assuming market risk related to the fluctuation in security value during the estate or trust settlement period and your final distribution amount will be subject to the prevailing market value of the subject securities. In addition, if an in-kind distribution is elected we require that you execute Letters of Direction allowing us to continue to hold these securities for your benefit. Please acknowledge your receipt of this letter by indicating your distribution preference and signing below.

We are still in the early stages of administration, however, we will keep you apprised as we progress and get closer to making appropriate distribution. In the interim, feel free to call me with any questions or concerns regarding this letter or otherwise[.]

The letter was signed by Matthew Buyer, the First Vice President and trust officer at SunTrust who served as Plaintiff's primary contact regarding the administration of Mrs. Glass's estate and the administration of the trust. Plaintiff also signed the letter and placed a checkmark in the space for "In-Kind," as opposed to the space for "Cash."

The parties have differing opinions as to the meaning of the February 1, 2007 "in-kind" letter. Mr. Buyer, the trust officer for SunTrust, who is also an attorney, interpreted the letter as an offer by SunTrust to allow Plaintiff the option of receiving the three particular bank stocks owned by the trust in-kind. In other words, Mr. Buyer believed

that when Plaintiff elected to receive "in-kind securities," he wanted to receive from the estate the three specific stocks owned by Mrs. Glass on the date of her death. Mr. Buyer testified that he also had a telephone conversation with Plaintiff during which Plaintiff "said that he wanted those stocks in kind." At trial, Mr. Buyer produced an "Activity & Time Log" containing records of his communications with Plaintiff, and it listed a January 22, 2007 telephone call from Plaintiff with the notation that Plaintiff "wants stocks in-kind." Mr. Buyer said he interpreted this oral direction to implicitly mean "do not sell those stocks."

Mr. Buyer acknowledged that he did not ask Plaintiff to sign additional "Letters of Direction" as mentioned in the letter. He explained that SunTrust sometimes obtains a release from a beneficiary in the form of a letter of direction or letter of retention if the beneficiary does not want SunTrust to diversify a portfolio. However, he explained that such letters are typically only required by SunTrust if specific assets are retained for more than one year, and the stocks at issue in this case were distributed in less than a year.[5] Rather than an additional letter of direction or retention, SunTrust relied on Plaintiff's election in the February 1, 2007 "in-kind" letter for an in-kind distribution of assets from the estate. Mr. Buyer testified that SunTrust never developed a plan for diversification of the assets in the trust because Plaintiff, through the in-kind letter, instructed SunTrust to hold the shares for final distribution to him "in-kind."

Plaintiff testified about his understanding of the letter as well. Plaintiff was an experienced trust officer himself. He had worked at First Tennessee Bank as a trust officer for 26 years and at two other banks as a trust officer for 23 years. Plaintiff had a master's degree in business administration and a law degree. He was the former head of a trust administration department and at one time administered around 180 trusts. By the time of trial, Plaintiff was a partner in a wealth management company and managing over $700 million in assets as an investment manager.

Plaintiff learned that he was a beneficiary of his mother's trust when he obtained a copy of her will after she died. Plaintiff testified that because the trust owned only three stocks, he assumed that SunTrust would make investment changes to preserve the principal and diversify the portfolio. Plaintiff admitted to signing the in-kind election letter but claimed that Mr. Buyer did not otherwise discuss the investments with him. With regard to the letter, Plaintiff testified, "They asked m[e] how I wanted my assets. I said in kind." However, Plaintiff interpreted the letter to mean that whatever stocks were owned by the trust when the trust assets were ultimately distributed would be distributed to him in-kind. He anticipated that the stocks distributed in-kind would be different than those currently owned by the trust because of his assumption that SunTrust would sell

---

[5]Mr. Buyer referred to this type of trust as "an interim Trust" due to its limited existence during the administration period after death.

and diversify the stocks. Plaintiff testified that when he worked as a trust officer, he asked any beneficiary who wanted to retain specific assets in a trust to sign a letter releasing the trustee from liability.

Plaintiff testified that he simply assumed that SunTrust would diversify the assets. He conceded that he never communicated to SunTrust his opinion that holding the three bank stocks was inappropriate or his disagreement with the current allocation of the trust assets. Each month during the trust administration period, Plaintiff received a monthly account statement from SunTrust containing detailed information about the trust and its investments. Among other things, the statements listed the particular stocks owned by the trust and all of the transactions during the statement period. The statements listed the number of shares owned, the price per share, the market value of all the shares held by the trust, the percentage of the total trust portfolio that each stock comprised, and other information. Plaintiff admitted that he received all of the monthly statements, he understood "every bit" of the information in the statements, and he knew what assets were in the trust because of the monthly statements. Still, throughout 2007, he did not contact SunTrust to complain about the fact that it had not sold the bank stock or diversified the portfolio. Plaintiff testified that, in his opinion, three bank stocks were not a proper investment, but, he said, "I was waiting for them to do an examination to tell me how to preserve the principal and diversify. That was their job. It wasn't mine." Plaintiff said, "If that had been my account, I would have jumped all over it."

Four months after the date of the "in-kind" letter, on June 6, 2007, Mr. Buyer wrote another letter to Plaintiff "to bring [him] up to date on the estate." Mr. Buyer informed Plaintiff that the estate tax returns were due in the near future and that SunTrust would have to sell some assets in order to raise money to pay estate taxes. Mr. Buyer informed Plaintiff that SunTrust was considering making a partial distribution of the trust assets, including a portion of the First Tennessee stock and SunTrust stock, while retaining a reserve for taxes and expenses. He estimated that SunTrust might be able to distribute 8,350 shares of the First Tennessee stock and about 1,000 shares of SunTrust stock. Mr. Buyer asked for instructions regarding "where and when [Plaintiff] would like me to send these shares." In response, Plaintiff sent a handwritten letter to Mr. Buyer indicating that he would like to receive 3,533 shares of First Tennessee stock, 1,577 shares of SunTrust stock, and 523 shares of Security Bancorp stock. Plaintiff's handwritten letter explained that Security Bancorp was Plaintiff's father's favorite bank stock, as he was an original investor in the bank. Plaintiff wrote that Security Bancorp was his favorite bank stock as well, as he "grew up in the bank," and, like his father, he wished to keep Security Bancorp stock in his family. SunTrust subsequently distributed the stock shares to Plaintiff in-kind and in the amounts he requested.

Three months later, Mr. Buyer sent another letter to Plaintiff updating him on the

10

status of the estate. He informed Plaintiff that SunTrust would be filing the necessary tax returns in the following week and expected to make another distribution in the near future. Mr. Buyer asked if Plaintiff wanted stock certificates as he had in the past. Plaintiff responded with a letter requesting a specific number of shares of First Tennessee stock and all of the SunTrust shares that could be distributed. SunTrust again distributed the shares requested by Plaintiff.[6]

SunTrust sold some of the remaining shares of bank stock in order to pay the estate's tax liability. All of the remaining stock was distributed in-kind to Plaintiff by December 2007. However, since the date of Mrs. Glass's death in January 2007, the value of the shares of SunTrust stock and First Tennessee Bank stock had plummeted. The combined value of these two stockholdings at the date of Mrs. Glass's death was $1,796,508. According to Plaintiff's expert, the value of these two stockholdings declined by $243,464 during the period of less than a year between the date of Mrs. Glass's death and the dates of distribution. As a result, Plaintiff claims that his one-half beneficial interest in the trust was damaged by $121,732 due to SunTrust's failure to sell the stocks after Mrs. Glass's death and diversify the portfolio.

In order to determine whether SunTrust had a mandatory duty to sell the bank stock and diversify the trust assets, we again start with the terms of the trust instrument. In the section of the trust instrument entitled "Powers, Duties, Privileges and Immunities of Trustee," the trust instrument provided:

> Plenary authority is hereby granted by Grantor to the Trustee (and wherever it appears this term includes every Successor Trustee) to exercise everything it deems advisable with respect to the administration of the Trust, even though such powers would not be authorized or appropriate for the Trustee under statutory or other rules of law.

The trust instrument also granted the trustee the power:

> To retain investments that initially come into the hands of the fiduciary among the assets of the estate, without liability for loss or depreciation or diminution in value resulting from the retention, so long as in the judgment of the fiduciary it is not clearly for the best interests of the estate, and the distributees of the estate, that those investments be liquidated, although the

---

[6]At trial, Plaintiff explained that he did not want to receive all of the shares of First Tennessee stock at that time because he "owned a ton outside the Trust [him]self personally," around 40,000 shares, and he did not want to be overloaded. Plaintiff also personally owned numerous other bank stocks, including Citigroup, Wachovia, Bank of America, SunTrust, and Wells Fargo. Plaintiff acknowledged that he may have made this decision based on his ability to take losses on his personal income tax return.

investments may not be productive of income or otherwise may not be such as the fiduciary would be authorized to make[.]

Finally, the trust instrument provided:

> In managing, investing and controlling the Trust, the Trustee shall exercise the judgment and care under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital, and, in addition, the purchasing power of income distribution to beneficiaries. . . .

> So long as the Trustee shall act in good faith and reasonable business prudence, it shall not be liable for any loss or damage to the Trust estate or the beneficiaries thereof by reason of any error of judgment or discretion.

The trust instrument directed the trustee to distribute Plaintiff's one-half of the net residuary trust estate to him "in cash or other assets."

In addition to these provisions in the trust instrument, several statutes are also particularly relevant to our decision. The Tennessee Uniform Trust Code provides that in the absence of a breach of trust, a trustee is not liable to a beneficiary for a loss or depreciation in the value of trust property or for not having made a profit. Tenn. Code Ann. § 35-15-1003. It recognizes that "[a] trustee is not an insurer." *Id.* at cmt.

The Tennessee Uniform Trust Code also incorporates by reference the Tennessee Uniform Prudent Investor Act.[7] Tenn. Code Ann. § 35-15-901. The Tennessee Uniform Prudent Investor Act prescribes a trustee's responsibilities with respect to the management and investment of trust property. Tenn. Code Ann. § 35-15-101 cmt. Using language in the trust instrument comparable to the "prudent person rule" (as Mrs. Glass did) will authorize any investment or strategy permitted under the Uniform Prudent Investor Act. Tenn. Code Ann. § 35-14-112. The Prudent Investor Act addresses diversification, in pertinent part, as follows:

> (a) A trustee shall diversify the investments of the trust:
> (1) Unless the trustee reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying, or

---

[7]We note that most of the Uniform Trust Code consists of default rules that apply only if the terms of the trust fail to address or insufficiently cover a particular issue. Tenn. Code Ann. § 35-15-101 cmt.

(2) Except as otherwise provided in subsection (b).

(b)(1) In the absence of express provisions to the contrary in the governing instrument, a fiduciary may without liability continue to hold property received into a trust at its inception or subsequently added to it or acquired pursuant to proper authority if and as long as the fiduciary, in the exercise of good faith and reasonable prudence, discretion and intelligence, may consider that retention is in the best interest of the trust and its beneficiaries or in furtherance of the goals of the trustor as determined from that instrument. Such property may include capital stock in the corporate fiduciary[.]

Tenn. Code Ann. § 35-14-105. This section demonstrates that prudent investing ordinarily requires diversification; however, circumstances can overcome the duty to diversify. *Id.* at cmt.

The Prudent Investor Act also provides that "[a] trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust." Tenn. Code Ann. § 35-14-104(b). Even though Plaintiff focuses only on the SunTrust and First Tennessee stockholdings, we must bear in mind that the trust owned more than just these two stocks.

Before we can decide whether the circumstances present in this case justified SunTrust's decision regarding diversification, applying the aforementioned principles, it is necessary to decide how to interpret the February 1, 2007 "in-kind" election letter. In short, SunTrust interprets the letter as an explicit direction from Plaintiff *not* to diversify the assets, while Plaintiff claims it was not. Not surprisingly, SunTrust's expert agreed with SunTrust's interpretation of the letter, while Plaintiff's expert agreed with Plaintiff's interpretation. The trial court concluded that Plaintiff "elected not to liquidate the investment [and] requested the investments in-kind[.]" The trial court concluded that Plaintiff's in-kind election essentially froze the stocks in the trust. After carefully reviewing the language of the letter and the parties' circumstances, we agree with SunTrust and the trial court. The two pivotal paragraphs of the in-kind election letter state:

As a beneficiary of the above mentioned Estate you have the option of receiving your share of the assets in the form of a cash payment or in the form of in-kind securities. Should you choose a cash payment, you would not be assuming market risk related to the fluctuation in security values during the estate or trust settlement period. And as a result, once we

13

receive all pertinent information, we intend to liquidate all securities and invest the proceeds in appropriate interest bearing investment grade fixed income securities (including money market) until such time as we are able to make a distribution.

However, if you choose to receive your distribution in the form of in-kind securities you will be assuming market risk related to the fluctuation in security value during the estate or trust settlement period and your final distribution amount will be subject to the prevailing market value of the subject securities. In addition, if an in-kind distribution is elected we require that you execute Letters of Direction allowing us to continue to hold these securities for your benefit.

In our view, the last sentence clearly demonstrates SunTrust's intention with regard to the in-kind election. If Plaintiff elected an in-kind distribution, SunTrust would require additional documentation because it intended "to continue to hold these securities for your benefit." The fact that SunTrust did not ultimately obtain additional letters of direction is not determinative. Additional letters of direction may have been useful or even advisable, but Plaintiff has not cited any authority to suggest that they were mandatory. SunTrust's expert testified with regard to such letters that "[s]ome trustees do that and some do not." Even without additional letters of direction, SunTrust had a written instruction from Plaintiff in the in-kind letter regarding his preference for in-kind distribution of his share of the assets of the estate.[8]

The remaining question is whether SunTrust had a mandatory duty to sell the bank stocks and diversify the portfolio under the circumstances presented. The trust instrument specifically gave SunTrust the power to retain investments that initially came into its hands without liability for loss or depreciation or diminution in value resulting from the retention so long as in SunTrust's judgment it was "not clearly for the best interests of the estate, and the distributees of the estate, that those investments be liquidated." The trust instrument also utilized a prudent person standard, implicating the Tennessee Uniform Prudent Investor Act, which provides that a trustee may refrain from diversifying the trust assets if the trustee "reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying." Tenn. Code Ann. § 35-14-105. SunTrust correctly notes in its brief that "Tennessee caselaw regarding what constitutes a special circumstance under UPIA Section 105 is sparse to non-existent." In fact, no Tennessee appellate decisions have discussed or cited section 35-14-105. The trial court found that special circumstances existed because of Plaintiff's in-kind election freezing the assets in the trust, as SunTrust could not have sold the assets

---

[8]In fact, at trial, Plaintiff's counsel and SunTrust's expert both referred to the February 1, 2007 in-kind election letter as "the letter of instruction."

of the trust without violating the express instruction of the beneficiary.

We likewise deem it appropriate for a trustee to consider an express direction from a beneficiary when deciding whether to sell and diversify the trust's assets. The Prudent Investor Act lists certain circumstances that a trustee may consider in managing and investing trust assets, and one of those circumstances is "[a]n asset's special relationship or special value, if any, to the purposes of the trust or to one (1) or more of the beneficiaries." Tenn. Code Ann. § 35-14-104(c)(8). The official comment to this statute explains that this subsection would allow the trustee "to take into account any preferences of the beneficiaries respecting heirlooms or other prized assets." *Id.* at cmt. Therefore, it was not improper for SunTrust to consider Plaintiff's directions when considering whether to sell and diversify the assets in the trust. *See, e.g.*, *Adams v. Regions Bank*, No. 3:14CV615-DPJ-FKB, 2016 WL 71429, at *10 (S.D. Miss. Jan. 6, 2016) (concluding that "special circumstances" existed within the meaning of Mississippi's version of the Uniform Prudent Investor Act where the beneficiary approved of the retention of stock by signing a retention agreement; the trustee did not breach its duties by failing to diversify); *In re Trust Created By Inman*, 693 N.W.2d 514, 521 (Neb. 2005) (noting that a beneficiary's professed sentimental attachment to farmland could be a special circumstance justifying non-diversification); *Wood v. U.S. Bank, N.A.*, 828 N.E.2d 1072, 1079 (Ohio Ct. App. 2005) (stating that the "special circumstances" language in the UPIA includes situations involving "holdings that are important to a family or a trust").[9]

In the case before us, Mr. Buyer testified that SunTrust actually considered *several* factors when deciding not to sell the bank stock or diversify the trust's assets during the estate or trust settlement period. SunTrust considered the specific stock distribution instructions given by Plaintiff in the February 1, 2007 in-kind letter. As noted above, Mr. Buyer's understanding of the in-kind election letter was that it essentially froze the assets that were held by the trust because the beneficiary wanted to receive those particular assets in-kind (with the exception of those shares sold to pay taxes). Mr. Buyer testified that if SunTrust had sold the bank stocks, it would have violated the express instruction he had received from Plaintiff.

According to Mr. Buyer, SunTrust also considered the dividend yield of the stocks, as these two bank stocks paid large dividends to the trust, totaling nearly $50,000, during the administration period. SunTrust also considered the Glass family's history of ownership of bank stock. Mr. Buyer testified that when SunTrust became the successor trustee in 2004, when Mrs. Glass became mentally incapacitated, the trust already owned the SunTrust stock, the First Tennessee Bank stock, and the Security Bancorp stock. He testified that the stocks had an extremely low cost basis, which indicated that they had

---

[9]SunTrust's expert and Plaintiff's expert both agreed that a beneficiary's direction not to diversify could be considered a "special circumstance" within the meaning of the statute.

been held for a long time and appreciated for "many, many years."[10]  Considering all these factors, SunTrust decided not to liquidate the bank stock in order to diversify the trust portfolio during the administration period.

Mr. Buyer also testified that Plaintiff never complained about the fact that SunTrust did not sell the bank stocks and diversify the portfolio.  In fact, he pointed out, Plaintiff specifically requested distributions of the three particular bank stocks and indicated that Security Bancorp was his favorite stock.  According to Mr. Buyer, Plaintiff never had any communication with SunTrust that was inconsistent with SunTrust's understanding of the in-kind election letter.

Having carefully reviewed the record, we agree with the trial court's conclusion that SunTrust did not breach a duty to Plaintiff by failing to liquidate the bank stock and diversify the portfolio.  Plaintiff had executed written documentation electing an in-kind distribution of the stocks in the estate, acknowledging that SunTrust would continue to hold "these securities" for his benefit.  Plaintiff's actions over the course of the next year were consistent with SunTrust's understanding of the in-kind election letter.  The Glass family had owned these stocks for years, and they continued to pay large dividends to the trust during the administration period.  SunTrust did not have a mandatory duty to diversify because it "reasonably determine[d] that, because of special circumstances, the purposes of the trust [were] better served without diversifying."  Tenn. Code Ann. § 35-14-105(a)(1).  Given the circumstances existing at the time,[11] and the limited duration of the trust, SunTrust acted as a reasonably prudent person and was not negligent in its decision regarding diversification.

### C.    *Farm Lease*

The third issue raised by Plaintiff on appeal involves the large farm owned by the trust.  The farm consisted of 295 acres.  Mrs. Glass leased the farm during her lifetime pursuant to a lease agreement dated November 18, 2002.  The term of the lease extended from January 1, 2003, until December 31, 2007.  Mrs. Glass died on January 2, 2007, during the original term of the lease.  The lease provided that its obligations were binding upon the parties' heirs, legal representatives and successors in title.  However, the lease also contained the following provision regarding its termination:

---

[10]Mr. Buyer testified that the number of shares of bank stock owned by the trust was originally much higher, but when SunTrust became successor trustee, it sold some of the SunTrust stock and the First Tennessee stock each year to pay for Mrs. Glass's living expenses.

[11]"Compliance with the prudent investor rule is determined in light of the facts and circumstances existing at the time of a trustee's decision or action and not by hindsight."  Tenn. Code Ann. § 35-14-110.  Not every investment or management decision turns out in the light of hindsight to have been successful, but hindsight is not the relevant standard.  *Id.* at cmt.

16

In the event of the death of Ann H. Glass, this lease will terminate on December 31, 2007. Should her death occur after December 31, 2002 and prior to December 31, 2007 this lease will terminate after the harvest of any then planted crop, however, if a crop has not been planted this lease will terminate on the date of death of Ann H. Glass.

After Mrs. Glass died, Mr. Buyer discussed the lease with the farmer who leased the property and informed him that the existing lease would be honored through December 31, 2007.

Plaintiff asserts that the farm lease expired on the date of death of Mrs. Glass, and therefore, SunTrust was negligent in failing to either terminate the lease or renegotiate the terms of the lease for a higher rental payment for 2007. The lease provided for a rent obligation of $65 per acre per year, and Plaintiff testified at trial that he contacted the local Farm Bureau agency in Dyer County and was told that the fair rental value of the land was between $80 and $85 an acre.

Mr. Buyer testified that he and the existing tenant discussed the ambiguity regarding the lease termination date after Mrs. Glass died. Mr. Buyer considered the lease provisions to be contradictory. Mr. Buyer testified that he decided to essentially honor the existing farm lease for the remainder of 2007 because the farmer who leased the property had always been a good tenant, he had farmed the land for years, and it was late in the season for him to try to find someone else to farm the land for the upcoming year. Mr. Buyer noted the uncertainty and various risks he would face if he attempted to find a new tenant, including the risk of nonpayment. Mr. Buyer explained that the land was located in Dyer County and that he was not personally familiar with the farmers there. Mr. Buyer testified that he drove to the property, met with the current tenant, and examined the land, and Mr. Buyer determined that the current tenant was taking good care of it. Mr. Buyer testified that he never had any issues with the current tenant causing erosion or waste or improper application of chemicals. The current tenant also prepaid his rent in cash each year, which, according to Mr. Buyer, was very unusual for farmers and very beneficial for a lessor. Overall, Mr. Buyer characterized the decision to continue the lease as "low risk."

On appeal, Plaintiff argues that SunTrust's decision regarding the farm lease violated three statutory duties within the Uniform Trust Code: the duty to administer the trust as a prudent person, Tenn. Code Ann. § 35-15-804, the duty to keep beneficiaries reasonably informed about the administration of the trust, Tenn. Code Ann. § 35-15-813(a)(1), and the duty to administer the trust solely in the interest of the beneficiaries as those interests are defined in the trust instrument, Tenn. Code Ann. § 35-15-802.

17

Regarding the alleged lack of communication, the trial court found that SunTrust voluntarily offered information to Plaintiff regarding the estate and trust and did not breach its duty to reasonably inform Plaintiff about the administration. With specific regard to the farm lease, the trial court found that the lease was inconsistent regarding its termination date, the factors SunTrust considered when deciding whether to continue the lease were reasonable, and SunTrust acted prudently by taking those circumstances into consideration. The trial court concluded that SunTrust exercised the requisite care, skill, and caution under the circumstances of this case and was not negligent. We agree with these conclusions. SunTrust considered numerous relevant factors and circumstances, detailed above, and it exercised reasonable care, skill, and caution in its decision regarding the farm lease.[12] SunTrust also kept Plaintiff reasonably informed about the administration of the trust and the farm lease. Plaintiff failed to demonstrate that SunTrust administered the trust in a manner that was adverse to his beneficial interest as that interest was defined under the terms of the trust. This issue is without merit.

### D.    Attorney's Fees

The final issue we review on appeal involves the trial court's award of attorney's fees. As previously noted, the trial court's original order ruled in favor of SunTrust on the claims asserted by Plaintiff, but the order specifically reserved a ruling on SunTrust's request for attorney's fees and/or refunding of the expenses it had incurred in this litigation, pending a subsequent hearing. Before a hearing was held, Plaintiff filed a notice of appeal to this Court. Recognizing that the order appealed was not a final, appealable judgment, this Court entered a show cause order directing the appellant to either obtain the entry of a final order or show cause why the appeal should not be dismissed. The trial court subsequently entered an amended order granting SunTrust's request for attorney's fees and/or refunded expenses in the amount of $202,468.71.

On appeal, Plaintiff presents several arguments regarding the trial court's award. Plaintiff claims that SunTrust did not assert a valid matured counterclaim and that an award of attorney's fees was inappropriate in the absence of a statute, contract, or recognized equitable basis for such an award. In response, however, SunTrust claims that Plaintiff "does not have the right to include this issue in his appeal" because he "consented to the final relief" on this issue. According to SunTrust, after the show cause order was entered by this Court, Plaintiff declined to have a hearing, and the parties agreed on a resolution of SunTrust's counterclaim for attorney's fees and/or refunding expenses. According to SunTrust, it agreed to reduce the amount of its fee request, and Plaintiff agreed to the entry of an amended order granting the counterclaim. Thus,

---

[12]Even Plaintiff's expert agreed that the lease was "[a]bsolutely" contradictory regarding its date of termination.

SunTrust claims that Plaintiff cannot now complain about the trial court's decision to which both parties consented.

According to Plaintiff's reply brief, "[h]ere is what happened."

On December 15, 2015 this Court entered an Order to Show Cause, as the Final Order of September 2, 2015 contained a reservation of ruling on Defendants' Counterclaim.

At that point Plaintiff's counsel had two (2) choices. One, to have this Court dismiss the appeal resulting in waiting on the Trial Court to hold a hearing and rule on the counterclaim issue with loss of time and considerable additional attorney fees; or keep the appeal in place and have the Trial Court render an Amended Final Order.

The Trial Court had already ruled in favor of Defendants on the negligence issues, which was being appealed, and in the opinion of Plaintiff's counsel would likely grant Defendants' Counterclaim.

In an effort to save money and time, and realizing no matter what the Trial Court would rule and which would ultimately be decided by this Court, sought the approval of Defendants' Counsel to have the Trial Court enter an Amended Order granting the Counterclaim in consideration of Plaintiff's counsel's agreement to the amount of attorney fees and expenses incurred by Defendants which would likely be the major part of any hearing on the Counterclaim. Plaintiff's counsel told Defendants' counsel that he would agree to a dollar figure if he would eliminate any fees and expenses related to the two (2) previous appeals, which Defendants lost, and that Plaintiff's counsel would trust him to do so. He provided counsel the figure of $202,468.71 and this amount was and is accepted by Plaintiff as the amount due Defendants but only if their Counterclaim and Application for Fees is sustained by this Court on appeal.

The Final Amended Order contains the signature of Plaintiff's counsel only as approving the Order in form, not in content. Record, Vol. 19 at 4.

Plaintiff's counsel as an Officer of this Court states that he told Defendants' counsel he did not concede the Counterclaim but was only agreeing to the dollar amount if the Counterclaim issue was decided in Defendants favor.

None of this is in the record but it clearly was done to preserve the appeal; save attorney fees; and put the issue before this Court where it would ultimately be in any event.

Basically, then, Plaintiff acknowledges that he declined the opportunity to have a

hearing before the trial court on the issue of attorney's fees and/or expenses. He concedes that one of his two choices, when faced with the show cause order, was "waiting on the Trial Court to hold a hearing and rule on the counterclaim." Unfortunately for Plaintiff, he did not elect that option. Instead, he "sought the approval of Defendants' Counsel to have the Trial Court enter an Amended Order granting the Counterclaim." Plaintiff claims that this maneuver "put the issue before this Court where it would ultimately be in any event," while saving the parties the time and expense of a hearing before the trial court.

Although this strategy may have seemed wise to Plaintiff at the time, we cannot condone such a practice. The issues regarding SunTrust's counterclaim for attorney's fees and expenses were for the trial court to decide in the first instance, not this Court. Plaintiff cannot simply "have the Trial Court render an Amended Final Order" granting a judgment against him, for his convenience, and then complain on appeal that the trial court erred in doing so. This Court is not required to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. 36(a). In other words, "we are not required to grant leave to a party who invited error[.]" *McLemore ex rel. McLemore v. Elizabethton Med. Inv'rs, Ltd. P'ship*, 389 S.W.3d 764, 793 (Tenn. Ct. App. 2012). Appellate courts are "loath to place a trial court in error when the party complaining on appeal failed to take corrective action with respect to any error which allegedly occurred below, and we are particularly loath to do so where the complaining party affirmatively acquiesced in the trial court's action." *State v. Schiefelbein*, 230 S.W.3d 88, 117 (Tenn. Crim. App. 2007). *See, e.g.*, *Byrnes v. Byrnes*, 390 S.W.3d 269, 273 (Tenn. Ct. App. 2012) (holding that a party could not challenge a child support award on appeal when she expressly agreed in the trial court to the award she sought to challenge).

We express no opinion on appeal regarding the correctness of the trial court's order regarding attorney's fees. We simply hold that if any error exists in the trial court's order, it was certainly invited by Plaintiff, and he must bear the consequences of invited error. Plaintiff created his own predicament and cannot complain about it on appeal.

## V. CONCLUSION

For the aforementioned reasons, the decision of the probate court is hereby affirmed and remanded for further proceedings. Costs of this appeal are taxed to the appellant, John D. Glass, and his surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE