IN RE TRUST CREATED BY LAVOHN C. ISVIK, DECEASED.
SECURITY NATIONAL BANK, TRUSTEE OF THE LAVOHN C. ISVIK
REVOCABLE TRUST, APPELLEE, AND IOWA STATE UNIVERSITY
FOUNDATION ET AL., INTERESTED PARTIES, APPELLEES,
v. MARY ELLEN RICKERT AND LAVOHN C.
STINE, APPELLANTS.
741 N.W.2d 638

Filed November 30, 2007. No. S-06-420.

William J. Lindsay, Jr., and Francie C. Riedmann, of Gross & Welch, P.C., L.L.O., for appellants.

Richard J. Gilloon and Bradley B. Mallberg, of Erickson & Sederstrom, P.C., for appellee Security National Bank.

David S. Houghton and J.P. Sam King, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., for appellees Iowa State University Foundation et al.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

LaVohn C. Isvik, as settlor of the LaVohn C. Isvik Revocable Trust, wrote a letter to the trustee stating that she was revoking the trust and requesting that all holdings of the trust be conveyed to her. Approximately 2 weeks later, she died unexpectedly. In trust administration proceedings commenced by the trustee following her death, the county court for Douglas County concluded that Isvik did not intend to revoke the trust, but only to discharge the trustee. The issue presented in this appeal is whether the court erred in reforming the revocation letter to conform to what it perceived to be Isvik's true intent. In resolving this issue, we must decide whether the county court also erred in relying upon extrinsic evidence of intent.

## I. BACKGROUND

Under the terms of the original trust created by Isvik in 1995, she was the sole trustee and her two daughters, Mary Ellen Rickert and LaVohn C. Stine, the appellants herein, were contingent death beneficiaries. Isvik reserved the right "[t]o amend or revoke this agreement, in whole or in part, by written instrument filed with my trustee . . . ."

In 2003, Isvik amended the trust instrument by naming George E. Nelson as cotrustee. After her husband died later that year, Isvik again amended the trust instrument to add beneficiaries and alter trust property distributions. Under the terms of the second amendment, the appellants were named the beneficiaries, upon Isvik's death, of certain real estate located in Douglas County, Nebraska. The amendment also added Iowa State University Foundation; Delta Tau Delta Scholarship Foundation, Inc.; Sigma Kappa Foundation, Inc.; Klemme United Methodist Church; and Trinity Lutheran Church (collectively the charities) as beneficiaries of the remainder of the trust assets.

Sometime thereafter, Isvik became dissatisfied with Nelson's performance as cotrustee. In December 2004, she sent a letter to Nelson, removing him as cotrustee and naming Security National Bank (the Bank) as successor trustee. The letter was drafted by Isvik's attorney William Lynch and signed by Isvik. In February 2005, Isvik executed a third amendment to the trust in which she appointed the Bank as sole trustee.

Isvik subsequently became dissatisfied with the Bank's performance in this capacity. In July 2005, she and Rickert met with Douglas Oldaker and James Kerkhove of the Bank's trust department. Although Oldaker was not present for the beginning of the meeting, Rickert testified that Isvik "shook . . . Kerkhove's hand . . . wished him a good day [and] said 'I'm revoking my trust.'" However, Oldaker and Kerkhove both testified that their impression from the meeting was that Isvik was only interested in removing the Bank as trustee. Oldaker asked Isvik to give the Bank 30 more days in which to address her concerns and improve its service. With Rickert's concurrence, Isvik agreed to Oldaker's proposal.

Still displeased with the Bank, Isvik composed a letter to Oldaker. Because of her impaired vision, Isvik dictated the letter to her personal assistant, Ruth Capps, who typed it. The letter, signed by Isvik and received by the Bank on August 26, 2005, stated in part: "I am revoking my Trust as of this date. Consider this my notice to you[.] Make no further transactions with any of my holdings and convey all materials pertaining to and including my holdings to me immediately." Rickert testified that she had a

telephone conversation with Isvik on August 25. She stated that Isvik had indicated that she had just sent a letter to the Bank revoking her trust and that she felt "'relieved.'"

Oldaker testified that when he received this letter on August 26, 2005, he called Isvik to inquire about her intent. Oldaker testified that, based on his legal training, he was concerned about her use of the term "revoking" and that he wanted to clarify that she actually intended to revoke the trust and thus alter the dispositive provisions of her estate. He reminded her that "by revoking the trust, it would throw the trust assets into probate." Oldaker testified that after this discussion with Isvik, he concluded that she wanted to act as her own trustee and did not want her trust assets to pass through probate. Oldaker stated that the Bank proceeded as if the trust had not been revoked.

Lynch testified that he also received a copy of the letter. On or about August 29, 2005, Lynch called Isvik "to find out why she sent the letter and what was going on." Lynch stated that his initial impression from Isvik was that she wanted to revoke the trust. However, after some discussion about the effects of revocation, Lynch concluded that Isvik only wanted to remove the Bank as trustee and did not want to revoke the trust. Lynch testified that he and Isvik agreed that he would prepare legal documents necessary to name new trustees of her trust.

Isvik was scheduled to meet with Lynch on September 7, 2005, to sign the new trust documents. On September 4, she died from injuries sustained in a fall 2 days earlier. As a result, Isvik never reviewed or signed the new trust documents.

After Isvik's death, the Bank filed a trust registration statement and a petition for trust administration with the county court for Douglas County pursuant to Neb. Rev. Stat. §§ 30-3812 to 30-3820 (Cum. Supp. 2006). The Bank sought "an order declaring whether the Trust was revoked by the August 26, 2005 letter or should be reformed to effect a change in trustee only." The appellants moved to dismiss the petition and strike the trust registration statement. Subsequently, the charities entered an appearance as interested parties.

The county court conducted a consolidated evidentiary hearing on the Bank's petition and the appellants' motion to dismiss. The unsigned documents prepared by Lynch were received in

evidence over the appellants' objection. Subsequently, the court entered an order in which it found by clear and convincing evidence that Isvik's use of the term "revoke" in her August 2005 letter "was a mistake and was only an attempt to change the trustee and not to terminate the trust itself." The court further determined that because the letter did not revoke the trust and no formal change of the trustee was made prior to Isvik's death, the Bank remained the trustee. The court directed the Bank to carry out the terms and administer the trust pursuant to Neb. Rev. Stat. § 30-3866 (Cum. Supp. 2006), and denied the appellants' motion to dismiss and motion to strike.

Following the entry of the county court's order, the appellants filed a motion requesting that no supersedeas bond or undertaking be required in order to pursue an appeal. The court entered an order on April 7, 2006, in which it required a supersedeas bond or undertaking in the amount of $50,000. On April 10, the appellants timely filed their notice of appeal and deposited the appropriate docketing fees and cost bond. On the same day, the appellants filed a "Bond Commitment" in the county court which professed their diligence in attempting to obtain a supersedeas bond. Attached to the bond commitment was a letter from a surety company stating that it would issue the bond upon receipt of an irrevocable letter of credit. On April 25, the appellants filed a $50,000 supersedeas bond with the clerk of the county court.

After this appeal was docketed in the Nebraska Court of Appeals, the Bank, joined by the charities, filed a motion to dismiss on grounds that the appellants failed to file a supersedeas bond or undertaking within 30 days of the county court's final order, as required by Neb. Rev. Stat. § 30-1601(3) (Cum. Supp. 2006). The Court of Appeals overruled the motion but ordered the parties to submit supplemental briefs on the issue, which they did. Subsequently, we moved the appeal to our docket on our own motion pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## II. ASSIGNMENTS OF ERROR

The appellants assign, restated, consolidated, and reordered, that the county court erred in (1) considering extrinsic evidence

of Isvik's intent in the trust revocation letter, (2) receiving exhibit 10, (3) finding that Isvik's trust revocation letter was a mistake, (4) reforming the terms of Isvik's trust revocation letter without clear and convincing evidence of a contrary intent, and (5) finding that the Bank was the trustee on the date of Isvik's death.

## III. STANDARD OF REVIEW

In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court.[1] When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[2]

Appeals involving the administration of a trust are equity matters and are reviewable in an appellate court de novo on the record.[3] A proceeding to reform a written instrument is an equity action.[4] Accordingly, we review the reformation issues in this trust administration proceeding de novo on the record. In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue.[5]

Statutory interpretation presents a question of law.[6] When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[7]

---

[1] *In re Trust of Rosenberg*, 273 Neb. 59, 727 N.W.2d 430 (2007).

[2] *Id.*

[3] *Id.*; *In re R.B. Plummer Memorial Loan Fund Trust*, 266 Neb. 1, 661 N.W.2d 307 (2003).

[4] *Haines v. Mensen*, 233 Neb. 543, 446 N.W.2d 716 (1989); *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986); *Hohneke v. Ferguson*, 196 Neb. 505, 244 N.W.2d 70 (1976).

[5] *Shearer v. Shearer*, 270 Neb. 178, 700 N.W.2d 580 (2005).

[6] *Rohde v. City of Ogallala*, 273 Neb. 689, 731 N.W.2d 898 (2007).

[7] *Id.*

■ Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion.[8]

## IV. ANALYSIS

### 1. APPLICABILITY OF NEBRASKA UNIFORM TRUST CODE

The revocable trust which is the subject of this proceeding was created in 1995. The Nebraska Uniform Trust Code (NUTC), Neb. Rev. Stat. §§ 30-3801 to 30-38,110 (Cum. Supp. 2006), was enacted in 2003 and became operative on January 1, 2005. Except as otherwise provided in the NUTC, it applies "to all trusts created before, on, or after January 1, 2005" and "to all judicial proceedings concerning trusts commenced on or after January 1, 2005."[9] This trust administration proceeding was commenced on September 22, 2005. We have noted that the NUTC is generally applicable to all trusts in existence on January 1, 2005, subject to certain statutory and perhaps constitutional exceptions.[10] Here, the parties have directed us to no exception to the applicability of the NUTC to the preexisting trust, and we have found none. Accordingly, we conclude that the NUTC applies to this proceeding.

### 2. SUPERSEDEAS BOND

As noted, the appellees' motion for summary dismissal was overruled but the parties were ordered to file supplemental briefs on the issue of whether the appeal should be dismissed because a supersedeas bond was not filed within 30 days of the order from which the appeal was taken. We address this threshold issue.

■ Appellate review under the NUTC is governed by § 30-1601(3), which provides in pertinent part:

When the appeal is by someone other than a personal representative, conservator, trustee, guardian, or guardian

---

[8] *Worth v. Kolbeck*, 273 Neb. 163, 728 N.W.2d 282 (2007).

[9] § 30-38,110(a)(1) and (2).

[10] *In re Trust Created By Inman*, 269 Neb. 376, 693 N.W.2d 514 (2005). See, also, John M. Gradwohl & William H. Lyons, *Constitutional and Other Issues in the Application of the Nebraska Uniform Trust Code to Preexisting Trusts*, 82 Neb. L. Rev. 312 (2003).

ad litem, the appealing party shall, within thirty days after the entry of the judgment or final order complained of, deposit with the clerk of the county court a supersedeas bond or undertaking in such sum as the court shall direct . . . conditioned that the appellant will satisfy any judgment and costs that may be adjudged against him or her . . . unless the court directs that no bond or undertaking need be deposited. If an appellant fails to comply with this subsection, the Court of Appeals on motion and notice may take such action, including dismissal of the appeal, as is just.

We view the authority to dismiss an appeal conferred by this statute as discretionary in nature, in that it directs that a court "may" take such action as is just. Generally, when the word "may" is used in a statute, "permissive or discretionary action is presumed."[11] Here, the record reflects that the appellants had initiated but not completed efforts to obtain a supersedeas bond within the 30-day period. The bond was actually filed 46 days after the entry of judgment. There is no indication that the late filing resulted in prejudice or delay. We conclude that dismissal would not be just under these circumstances.

### 3. REFORMATION

Isvik's final letter to the Bank is unambiguous. In the letter, she clearly and unequivocally stated, "I am revoking my Trust as of this date[,]" and she directed the Bank to convey all trust holdings and materials to her. In reforming this document, the county court relied upon the following provision of the NUTC:

The court may reform the terms of a trust, *even if unambiguous*, to conform the terms to the settlor's intention if it is proved by clear and convincing evidence that both the settlor's intent and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.[12]

---

[11] Neb. Rev. Stat. § 49-802(1) (Reissue 2004).

[12] § 30-3841 (emphasis supplied).

In order to resolve the questions presented in this appeal, we must initially decide whether Isvik's letter is subject to reformation under this provision. If so, we must determine whether extrinsic evidence as to Isvik's intent can be considered and, finally, whether there is clear and convincing evidence that Isvik's true intent at the time she signed and mailed the letter was to discharge the Bank as trustee but keep the trust in existence.

### (a) Was Letter "Term of a Trust" Subject to Reformation Under § 30-3841?

 The NUTC defines the phrase "terms of a trust" as "the manifestation of the settlor's intent regarding a trust's provisions as expressed in the trust instrument or as may be established by other evidence that would be admissible in a judicial proceeding."[13] Here, the trust instrument reflects the reserved power of the settlor, during her lifetime, "[t]o amend and revoke this agreement, in whole or in part, by written instrument filed with [the] trustee . . . ." This reserved power contemplates and indeed requires that the manifestation of a settlor's intent to revoke the trust must appear in a subsequently executed and delivered document which is distinct from the trust instrument itself. We conclude that a document by which a settlor purports to revoke a revocable trust is a term of that trust within the meaning of § 30-3841.

### (b) May Court Consider Extrinsic Evidence Regarding Settlor's Intent in Determining Whether Terms of Trust Were Affected by Mistake of Fact or Law and Thus Subject to Reformation Under § 30-3841?

The appellants argue that because Isvik's intent to revoke the trust was unambiguously stated in her letter to the Bank, the county court erred in receiving extrinsic evidence of a contrary intent. They rely upon *In re Trust Created by Cease*,[14] in which

---

[13] § 30-3803(19).

[14] *In re Trust Created by Cease*, 267 Neb. 753, 756, 677 N.W.2d 495, 498 (2004).

we held that parol evidence of intent should not have been admitted with respect to a document executed by the settlor of a revocable trust who was also its trustee, stating that he was resigning as trustee and that such resignation was "'intended to terminate said trust.'" We held that the document was unambiguous and operated to terminate the trust as a matter of law upon its execution.

*In re Trust Created by Cease* was decided before the NUTC became effective and did not involve the issue of reformation based upon mistake. Accordingly, it is not controlling on the precise issue presented here. Nor is this a case in which a party seeks to alter, vary, or contradict the terms of a written contract by proof of a prior or contemporaneous oral agreement, which would be prohibited by the parol evidence rule.[15] The parties have not directed us to any pre-NUTC Nebraska case law addressing the admissibility of extrinsic evidence of intent in an action to reform a trust instrument or related document, and this is our first occasion to consider the issue under the NUTC.

Section 30-3841 is taken verbatim from § 415 of the Uniform Trust Code. The comment to that section draws a distinction between reformation and resolution of an ambiguity:

> Resolving an ambiguity involves the interpretation of language already in the instrument. Reformation, on the other hand, may involve the addition of language not originally in the instrument, or the deletion of language originally included by mistake, if necessary to conform the instrument to the settlor's intent. Because reformation may involve the addition of language to the instrument, or the deletion of language that may appear clear on its face, *reliance on extrinsic evidence is essential.* To guard against the possibility of unreliable or contrived evidence in such circumstance, the higher standard of clear and convincing proof is required.[16]

The NUTC specifically provides that it is supplemented by the "common law of trusts and principles of equity" except to

---

[15] See *Par 3, Inc. v. Livingston,* 268 Neb. 636, 686 N.W.2d 369 (2004).

[16] Unif. Trust Code § 415, 7C U.L.A. 514, comment at 515 (2006) (emphasis supplied).

the extent modified by the code or another statute.[17] In equitable actions to reform other types of written instruments, we have held that extrinsic evidence is admissible to prove mistake and actual intent. For example, in an action involving reformation of an insurance policy, we noted that the "power of a court to correct a mutual mistake implies the admissibility of competent and necessary proof of such mistake."[18] We have held that the parol evidence rule does not apply in an action seeking reformation of a contract on grounds of mistake and fraud, because such evidence is necessary to a determination of the antecedent agreement between the parties.[19] In such cases, "the evidence . . . is mainly or wholly oral" because "[i]n order to prove the mistake it is indispensable to show by parol in what particulars the writing differs from the oral agreement."[20] Thus, we have held extrinsic evidence to be admissible in actions seeking reformation of deeds,[21] promissory notes,[22] and insurance policies.[23]

Here, Isvik unambiguously informed the Bank that she was revoking her trust. The county court was not asked to interpret her words, but, rather, to determine whether she wrote them in a mistaken attempt to achieve the different objective of leaving the trust in place but discharging the Bank as trustee. Based upon the comment to § 415 of the Uniform Trust Code and our consistent prior holdings that extrinsic evidence of intent is admissible in equitable actions for reformation of written instruments, we conclude that the county court did not err in receiving extrinsic evidence on the issue of Isvik's intent. We consider that evidence in our de novo review.

---

[17] § 30-3806.

[18] *Central Granaries Co. v. Nebraska L. M. Ins. Ass'n.*, 106 Neb. 80, 84, 182 N.W. 582, 584 (1921).

[19] *Johnson v. Stover*, 218 Neb. 250, 354 N.W.2d 142 (1984).

[20] *Story v. Gammell*, 68 Neb. 709, 712, 94 N.W. 982, 983 (1903).

[21] *Johnson v. Stover, supra* note 19.

[22] *Lincoln Equipment Co. v. Eveland*, 173 Neb. 174, 112 N.W.2d 755 (1962).

[23] *Fadden v. Sun Ins. Office*, 124 Neb. 712, 248 N.W. 62 (1933).

(c) Is There Clear and Convincing Evidence That Isvik's Intent
When She Signed and Mailed Her Letter to Bank
Was Not to Revoke Trust, but, Rather, to
Discharge Bank as Trustee?

The parties do not question Isvik's competency at the time she signed and mailed the letter. Isvik was a college graduate, was in good health, and appeared mentally alert and capable of handling her own affairs. Although her vision was impaired, she was able to read legal documents with the assistance of a mechanical device.

The evidence of Isvik's intent when she signed and mailed the letter to the Bank is primarily circumstantial and supports conflicting inferences. There is evidence to support a reasonable inference that Isvik intended to discharge the Bank as trustee but not revoke her trust. Several witnesses testified that Isvik was dissatisfied with the Bank's performance as trustee. Rickert testified that Isvik was upset with the Bank for not redistributing the assets between her trust and her husband's trust. She also indicated that Isvik was disturbed by the Bank's suggestion that she use her Social Security benefits for living expenses. Capps stated that Isvik was upset with the manner in which the Bank was handling distributions from her trust. Oldaker admitted that at their July 2005 meeting, Isvik expressed dissatisfaction with how the Bank was distributing money.

Lynch, as Isvik's attorney, had been aware of her dissatisfaction with the Bank's performance. When he received a copy of her letter, he called her to discuss her intent and determine his future role. From her response, he formed an initial impression that she intended to revoke the trust. However, after further discussion, he concluded that she intended to remove the Bank as trustee but not revoke the trust. In a similar vein, Oldaker testified that when he spoke with Isvik on the telephone after receiving her letter, he concluded that she wished to serve as her own trustee but not revoke her trust. He stated that Isvik indicated she did not want her estate to pass through probate.

Evidence of Isvik's fondness for the charities designated as trust beneficiaries also supports an inference that she did not intend to revoke the trust. Capps testified that Isvik had spoken

highly of the charities and stated that she wanted them to eventually receive the trust assets. Isvik's attorney testified that the documents he prepared after his telephone conversation with Isvik made no changes in the trust beneficiaries.

But there is also evidence supporting an inference that Isvik intended precisely what she said in her letter to the Bank. Isvik had previously signed documents prepared by her attorney which changed the designation of her trustee. None of these documents utilized language indicating revocation of the trust. Rickert testified that during a conversation with Isvik in July 2005, Isvik stated that she disliked having someone else owning her house and that she had said, "'I don't want the trust. I don't know why I need a trust. I can't see the point of the trust.'" Rickert also testified that when she accompanied Isvik to the Bank to meet with trust officers in July, Isvik expressed to Rickert, prior to the meeting, her desire to revoke the trust, but then agreed to allow the Bank more time to improve its performance. Rickert also testified that during a telephone conversation on August 25, Isvik stated that she had sent a letter to the Bank revoking her trust and that she felt "'relieved.'"

Capps testified that Isvik had discussed revoking her trust and that she believed she needed to do so in order to manage her own money. There is also evidence that Isvik understood that she could create a new trust after revoking the existing one. Capps testified that LaVohn was considering a new trust "to be used after [her] death or in [an] emergency."

As noted above, the testimony of Lynch regarding his telephone conversation with her following receipt of a copy of her letter to the Bank could support an inference of mistake. But the testimony could also be understood to mean that Isvik actually intended to revoke the trust at the time she signed and mailed the letter, but then changed her mind after discussing the matter with Lynch. Such a "post-execution change of mind" would not afford a basis for reformation.[24]

Because our review is de novo, we must reach an independent conclusion as to whether there is clear and

---

[24] Restatement (Third) of Property: Wills and Other Donative Transfers § 12.1, *comment h.* at 374 (2003).

convincing evidence that the unambiguous language used by Isvik was the product of mistake and that her true intent was only to discharge the Bank as trustee. Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.[25] It has been described as "more than a preponderance of evidence, but less than proof beyond a reasonable doubt."[26] Evidence may be clear and convincing despite the fact that other evidence may contradict it.[27] But even taking into consideration that the trial court saw and heard the testimony of the witnesses, we conclude that the conflicting evidence as to Isvik's intent is at least evenly balanced. Based upon our review of this record, we cannot reach a firm belief or conviction that Isvik mistakenly expressed her true intent in her letter to the Bank. Accordingly, we conclude that the county court erred in reforming the unambiguous written notice of revocation which Isvik submitted to the trustee.

## V. CONCLUSION

For the reasons discussed, we conclude that the county court did not err in receiving extrinsic evidence of Isvik's intent when she signed and mailed her letter to the Bank, in which letter she unambiguously stated that she was revoking her trust. Based upon our de novo review, we conclude that it has not been proved by clear and convincing evidence that Isvik's statement of her intent was the product of a mistake. The trust was revoked and ceased to exist prior to Isvik's death. Accordingly, we reverse the judgment of the county court and remand the cause with directions to vacate its order of March 10, 2006, and dismiss the trust administration proceeding.

REVERSED AND REMANDED WITH DIRECTIONS.

[25] *Nebraska Legislature on behalf of State v. Hergert*, 271 Neb. 976, 720 N.W.2d 372 (2006).

[26] *In re Interest of Eden K. & Allison L.*, 14 Neb. App. 867, 875, 717 N.W.2d 507, 514 (2006); *In re Interest of Kindra S.*, 14 Neb. App. 202, 705 N.W.2d 792 (2005).

[27] *In re Estate of Brionez*, 8 Neb. App. 913, 603 N.W.2d 688 (2000).