IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE ESTATE OF FOGED


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE ESTATE OF LEON G. FOGED, DECEASED.

LOREN FOGED, PERSONAL REPRESENTATIVE OF THE ESTATE OF LEON G. FOGED, APPELLEE,

V.

STEPHANIE M. KNAPP, APPELLANT.


Filed April 8, 2025.    No. A-24-269.


Appeal from the County Court for Sarpy County: S. COLIN PALM, Judge. Reversed and remanded with directions.

Sarah D. Duey and Anthony T. Baudler, of Smith Pauley L.L.P., for appellant.

Matthew S. McKeever and Layf J. Carlson, of Burnett Legal Group, L.L.P., for appellee.


RIEDMANN, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Stephanie M. Knapp, formerly known as Stephanie M. Foged, appeals from an order of the county court for Sarpy County denying her request for in-kind distributions from her father's estate. Knapp was the sole beneficiary of her father's will and testamentary trust. Her uncle, the personal representative, objected to her request, claiming that his brother's will empowered him to sell everything at his discretion. The county court denied Knapp's petition, concluding that the will contained a contrary intention to an in-kind distribution under Neb. Rev. Stat. § 30-24,104 (Reissue 2016). We reverse the county court's order and remand with directions.

- 1 -

BACKGROUND

Leon G. Foged passed away on November 22, 2022. Leon's will, executed in 2000, listed Knapp as the sole beneficiary of his estate. It also directed Loren Foged, Leon's brother, to serve as the estate's personal representative and trustee of the trust created under the will. It also clarified that "masculine pronouns may also denote the feminine or neuter." Other relevant provisions of Leon's will include:

II. Except as to property specifically disposed of herein, I hereby authorize my Personal Representative to sell (including the power to quiet title), lease, mortgage (beyond the tenure of his office), or cash in any and all property belonging to my estate, of every nature and wherever situated, publicly or privately, for cash or on time, without an order of any court, upon such terms and conditions as to him seem best, and for the purpose of paying debts or facilitating the division and distribution of my estate, or for such other purposes as he may deem advisable, without liability on the part of the purchaser to see to the application of the purchase money; and also to invest any monies of my estate, including the proceeds of any sale which he may make.

III. I direct that administration expenses . . . and all claims properly allowed against my estate shall be paid first. I direct that the Personal Representative of my will pay out of my residuary estate . . . all . . . taxes . . . .

IV. Subject to the foregoing, I give all of my property of every kind and nature and wherever situated to my daughter, Stephanie M. Foged, if she shall then be not less than thirty-five years of age.

V. If such beneficiary is, at the time of my death, under thirty-five years of age, then I give all of my property of every kind and nature and wherever situated to my Trustee, in trust for the uses and purposes and under the terms and conditions, and with the powers and duties hereinafter stated:

(a) My Trustee shall pay or apply the net income to or for the benefit of the beneficiary, for her care, support, maintenance and education until she shall have arrived at the age of thirty years. . . .

(b) When my daughter shall reach the age of thirty years, if the trust is of a value of $5,000.00 or less, the Trustee shall immediately distribute it to my said daughter or her descendants. If such trust is of a value in excess of $5,000.00, then the Trustee shall then distribute the full amount of the trust to the descendants of any deceased beneficiary and to any beneficiary who is then thirty-five years of age or older; shall distribute one-half of his share to each beneficiary who is then less than thirty-five years of age and shall pay to any such beneficiary the remaining one-half of his share when he arrives at the age of thirty-five years and in the meantime shall pay to him the income of such one-half share.

(c) If upon the termination of the trust herein my daughter shall be deceased and no lineal descendant of hers then survives, then the principal and any undistributed income of said trust shall be distributed as follows: to those persons who would be entitled to the distribution of my estate, had I died intestate and a residence of Nebraska.

(d) If, at the time of my death or before the trust herein provided for has been established, the conditions shall be fulfilled under which the trust is to be terminated in

whole or in part and the corpus thereof distributed, then such trust shall not be established . . . and my Personal Representative, instead of delivering such property to my Trustee, shall distribute it to the person or persons entitled thereto in accordance with the foregoing provisions for the distribution of the corpus of the trust to the beneficiaries thereof.

(e) Said Trustee shall hold, manage, lease, care for and protect said trust estate and collect the income therefrom, all in accordance with its best judgment and discretion. Said Trustee may, at its discretion, continue to hold any or all property or securities owned by me at the time of my death, or sell the same, and is also hereby authorized to invest such part of such estate as may from time to time be converted into cash in such manner as in its discretion it may deem proper and suitable and for the best interests of the trust estate. . . .

Knapp was 33 years old at the time of Leon's death. On February 16, 2023, Knapp filed a "Petition for Formal Probate of Will and Appointment of Personal Representative," wherein she nominated herself as the personal representative of Leon's estate. Loren objected; he requested that he be approved as personal representative of the estate. We note here that at the time of Leon's death, he owned two real estate properties on the same street in Gretna, Nebraska. We will refer to one as the "residence" and the other as the "rental property."

A hearing took place on May 9, 2023, during which the attorneys for the parties orally set forth their understanding of an agreement reached between the parties to resolve Knapp's petition and Loren's objection. No written agreement signed by the parties is contained in the record on appeal. As relevant to this appeal, it was verbally represented to the county court that Knapp and her husband were willing to take on various tasks to save the estate some expense. Knapp's attorney confirmed that "under the stipulation," Loren would act as personal representative, since that is what the original will indicated. It was represented that Knapp had "already done research" regarding getting the highest price for a vehicle, and that there had been "no objection to that." Knapp's attorney informed the court that Knapp wanted to sell the rental property at fair market value either "as-is" or with minimal repairs; the current tenants had not been paying rent and would need to be evicted. Knapp's attorney specifically informed the court that Knapp was going to make a request for an in-kind distribution of the decedent's residence and its contents. Loren's attorney acknowledged that "a request will be made . . . and we'll take the request under advisement at the discretion of the PR." Knapp and Loren were both asked if what they heard was consistent with their understanding, and both replied affirmatively. Loren's counsel agreed to draft a stipulated order for the court.

On July 11, 2023, the county court entered an order appointing Loren as the personal representative. The order indicated that the court had "received the stipulation of the parties on the record and the provisions of the stipulation are incorporated in this Order." As relevant here, the order contained the following provisions:

5. [Knapp] is the only child of . . . Leon . . . and is the sole beneficiary of [d]ecedent's estate. [Knapp] has already done a significant amount of work regarding the property of the Estate. [Knapp] is interested in keeping the costs of the [d]ecedent's [e]state to a minimum, obtaining the highest value for the [e]state [p]roperty, assisting in the disposition of [e]state [p]roperty, has taken numerous steps to secure and dispose of the

[d]ecedent's [r]eal [e]state, [p]ersonal [p]roperty and [b]usiness [p]roperty, including but not limited to the following steps:

. . . .

7. Both . . . Knapp and Loren . . . agree that they will take steps to sell all of [d]ecedent's [p]roperty at fair market value and shall cooperate and make a good faith effort to quickly and efficiently complete this [e]state.

. . . .

11. The parties agree that the estate shall be converted into an informal estate and Loren . . . shall initiate and file the proper pleadings to initiate a conversion of the case to an informal probate.

. . . .

13. [Knapp], as sole beneficiary of the estate, made a formal request on the record for in-kind distributions of (1) [t]he residence located at [street address], Gretna, Nebraska; (2) [t]he personal property located at [the Gretna residence]; and (3) [t]he business run by [d]ecedent. The Personal Representative shall give good faith consideration to said requests and such decisions shall be at the discretion of the Personal Representative.

. . . .

15. [Knapp] may request that the Personal Representative provide her access to the residence . . . at reasonable times. Such requests shall not be unreasonably denied and the Personal Representative, at his option, may accompany her during her access.

16. [Knapp] will install security cameras on the exterior and in the interior of the residence. . . . [Loren and Knapp] shall always have access to any recordings.

Loren accepted his appointment as personal representative on July 13, 2023. On July 26, Knapp filed a "Formal Request for In-Kind Distribution," which alleged that she was entitled to distribution of one-half of her father's estate. She reiterated her request for an in-kind distribution of the residence and its contents. She specifically asked that the real and personal property at that address not be sold. On August 15, Knapp, with new counsel, filed a "Petition for In-Kind Distribution and Trust Termination." In addition to the same relief requested in her previous petition for an in-kind distribution, she pointed out that the rental property and an automobile could be liquidated to pay any creditor claims. She alleged that it would be in her best interests if the residence and its property were distributed to her directly rather than establishing a trust. She therefore requested that the testamentary trust created under Leon's will "not be created" and that the personal representative should be ordered not to sell the residence and the personal property in it and that the requested in-kind assets be distributed to her by no later than October 31, 2023.

On August 31, 2023, Knapp filed a "Petition for Removal of Personal Representative." She claimed that Loren had "on multiple occasions, unreasonably denied" her access to the residence, had denied offers by her husband to mow the lawn at the rental property which caused the estate to incur unnecessary expenses, had failed to give good faith consideration to her request for in-kind distribution "of the personal property and business-related property" and had "threatened to 'sell everything,'" had failed to cooperate to "quickly and efficiently" complete the estate by not working with a realtor at a reduced commission to sell the rental property, and had blocked her calls when she was attempting to provide him information regarding creditors of the estate.

On October 30, 2023, Loren filed an "Objection to Petition for Removal of the Personal Representative," and an "Objection to Petition for Distribution In-Kind and to Disregard Trust." In support of his objection, he argued that "Article II of the Last Will and Testament of Leon Foged specifically authorizes the Personal Representative to sell or cash in any property of the Estate 'without the order of any court, upon such terms and conditions as to him seem best.'" Loren also claimed that § 30-24,104 "does not apply to this situation" because Leon's will "includes intentions contrary to the distribution of the estate in kind." He noted that Leon "had ample opportunity to change his estate plan to consider the age of his beneficiary[] but chose not to do so." Finally, Loren alleged that "[t]he parties already entered into a stipulated Order resolving the issues presented in the Petition."

An "Amended Inventory" was filed on November 20, 2023. It reflected the following assets: real estate ($510,000), which included the residence valued at $267,000 and rental property valued at $243,000; mortgages, notes, cash ($15,000), which included $5,000 in checking accounts and $10,000 for a vehicle; other miscellaneous property ($50,000), which included $25,000 for house furnishings and $25,000 for "Collectibles -- McDonald's Toys." The only mortgage, lien, or other encumbrance listed was an unsecured Wells Fargo note for $25,402.06.

The county court held evidentiary hearings on October 31 and December 12, 2023. During the hearings, exhibits were received into evidence, including Leon's will. Both Knapp and Loren testified, as well as the attorney who had drafted Leon's will. After the October 31 hearing, the court denied Knapp's request to remove Loren as the personal representative. The December 12 hearing provided the parties the opportunity to further address the request for in-kind distribution. The relevant evidence from both hearings is set forth next.

Knapp testified that she lived at the Gretna residence with her father for 24 years and now wished to live in the house with her own family. She explained that "[i]t's the only home [they] ever had that never left" and that she has "[a] lot of good memories there." At the time of her father's death, she claimed that Loren, "within 30 minutes of my dad passing," asked her what she planned to do with his house. According to Knapp, Loren "suggested that his daughter . . . could live there. And I said, No. And then he had suggested his son . . . could live there. And I said, This is a lot to talk about right now."

Knapp further testified that her father's business consisted of approximately 20,000 "vintage McDonald's toys," which she and her father started collecting together in the early 1990's. Her father began selling the toys on eBay in 1997, and she stated that she would like to continue his business. She did not believe the McDonald's toy collection could be rebuilt. Knapp indicated that the rental property owned by her father "would cover all the debts." She agreed that the rental property could be sold. A short video of Knapp talking with Loren in July 2023 was played and received into evidence. In that video, Loren told Knapp that he was "going to do exactly what [her] dad said to do, sell everything. That's what he said to do." Knapp asked, "So you're going to try to take my dad's house from me?" Loren responded, "We'll see, anything can happen."

Knapp also testified about asking Loren for entry into the residence. They had agreed to meet on May 15, 2023, to conduct an inventory of the home, but when Loren arrived, "he decided he no longer wanted to do it and we left." After Knapp called her attorney, she was later able to have access to the home. They scheduled to meet again on July 24. Knapp learned from a neighbor that locks were being changed on the residence and Knapp wanted to put cameras up on the home.

Loren again denied her access to the home. Loren allowed Knapp to install the cameras on the residence the next day; Knapp and Loren had not spoken since. Knapp said she had texted and left voice mails for Loren but that he never responded to her. She was aware that Loren opened bank accounts for both the estate and the trust "[o]nly after we asked." She was aware that Loren had evicted the tenants at the rental property and that appraisals for the real properties and the toy collection had been completed.

Loren testified that he believed Leon "gave [him] the discretion to sell everything" and that he was carrying out Leon's wishes in administering the estate. He acknowledged that the July 11, 2023, order did not "state specific assets that shall be sold within the estate." He indicated that the two real properties owned by the estate were worth approximately "[h]alf a million dollars." He was not sure of the total debts owed. The following colloquy then took place between Knapp's attorney and Loren.

[Attorney]: [Referring to July 11, 2023, order] . . . Have you given good faith consideration to Ms. Knapp's request for in-kind distribution.

[Loren]: Yes.

[Attorney]: How?

[Loren]: I have considered it. I don't know what -- I don't understand the question. Is that the same question twice in a row?

[Attorney]: No. The first question is: Have you given good faith consideration? And the second question is: How have you given, in what way have you given that consideration to . . . Knapp?"

[Loren]: It sounds like the same questions. I have considered it.

[Attorney]: To what extent have you considered it?

[Loren]: I think about it every day.

[Attorney]: Have you or your counsel responded to Ms. Knapp's requests for in-kind distribution?

[Loren]: I have not.

[Attorney]: Are you aware of any requests by Ms. Knapp for cash directly from the estate?

[Loren]. No.

. . . .

[Attorney]: . . . In the video you state that Leon wanted you to sell everything. How do you know that Leon wanted you to sell everything?

[Loren]: Well, I guess we could presuppose just about anything. But based on . . . the Will of Leon, there is an opportunity for Leon to put into this will anything that he would like to go directly to the beneficiaries. He opted to leave that empty . . . . What he did do, was . . . said I should use my discretion about what to do about the things that are not listed on that blank page.

. . . .

[Attorney]: So why do you believe that it is necessary to sell everything?

[Leon]: I don't believe it's necessary, but I believe it's what Leon wanted to have happen.

. . . .

[Attorney]: Have you thought about selling the rental real estate?

[Loren]: I have thought about a great many things.

[Attorney]: Have you specifically thought about selling the rental real estate?

[Loren]: I have thought about selling the rental real estate.

[Attorney]: Would the sale of the rental real estate cover any possible debts of the estate?

[Loren]: I'm not sure.

. . . .

[Attorney]: Why is it that you have not communicated with [Knapp] since August 22nd [2023]?

[Loren]: I'm represented by counsel. I got tired of the seventh-grade discussions.

When examined by his own attorney, Loren testified that he was a "CPA" and had prepared Leon's taxes "for years" and that Leon's toy collection business was not profitable. He stated, "I think it was more of a passion or a hobby." When asked if he had made a decision whether any of the property would be "distributed in-kind or cashed out or otherwise," he responded, "I have not." When asked by Knapp's attorney, why he believed Leon wanted him to sell everything, Loren responded, "I believe he gave me the discretion to sell everything, use my judgment whether I should sell everything or not." When asked, "Through his words in the will?" he responded, "Yes." Knapp's counsel asked Loren if he planned to sell the rental property. He responded, "Not my decision." Loren blamed Knapp's lawsuits and claimed that "we have squandered a good deal of what her father left for her." When Knapp's counsel asked Loren what "the market would bring" for the rental house, Loren responded, "I did not do any market analysis. The appraiser did the market analysis." The following colloquy then took place between Knapp's attorney and Loren:

[Attorney]: Do you know approximately what that appraisal states the value?

[Loren]: I'm sure you have a copy of it.

[Attorney]: So around 260,000? Does that sound about right?

[Loren]: I would have to look at the appraisal.

[Attorney]: Okay. Would you like to look at it?

[Loren]: More than life itself.

. . . .

[Attorney]: . . . [C]an you let me know what the appraiser said about the value of it.

[Loren]: $243,000.

Loren was then asked about liabilities of the estate. He indicated that there was a "DHHS" claim. When asked if it was for "about 19,000," Loren responded, "I would defer to counsel." He added that there were lawyer fees, utilities, and "expenses to ensure that the property is not mismanaged." He acknowledged that it was true that if he distributed the residence property in-kind, he "would be able to get rid of" all those expenses. He also acknowledged that the inventory submitted to the court reflected the contents of the residence valued at $25,000 and the "vintage toys" at $25,000.

The attorney who drafted Leon's will had been practicing law for "probably 37, 38 years" primarily in "probate and estate planning." He testified that he had known Leon "for maybe 30-plus years." In his experience, he "found maybe three or four instances in which assets need[ed] to be sold by a personal representative." He confirmed that the testamentary trust provided that Knapp should receive half of the assets at age 30 and the remainder at age 35. He also confirmed that he "declined" to represent Loren because he believed Loren's "intentions and what [he was] looking for [was] contrary to the decedent's desires." The attorney testified that Loren expressed his "strong desire to keep the personal residence . . . in the family name or to a family member, specifically his son or him." When the attorney was asked if the sale of the rental property would have been enough to cover the estate's debts, he responded, "It certainly appeared as though it would be by a long shot." When asked by Loren's attorney if there were "oftentimes very personal reasons why assets might be sold or not sold," the attorney responded, "Well, if it's a personal reason based on the preference of the sole beneficiary, yes, that might be a reason. But if it's a personal reason on behalf of the personal representative, absolutely not," a "personal representative's personal beliefs" do not have "anything to do with whether he should sell the property or not." He testified that when he drafts wills, he uses the word "shall" when there is no question about a testator's intention and uses the words "is authorized" to give some discretion to a personal representative to act in accordance with statutes.

On April 8, 2024, the county court issued an order denying Knapp's request for in-kind distributions and to terminate the trust. The court acknowledged that § 30-24,104 allowed for assets to be distributed in kind under certain conditions, unless there is a contrary intention indicated by a will. It reasoned that Leon's will provided the personal representative the authority "to sell any and all property." It then noted that if the beneficiary is under 35 years of age, then "all property is given to the trustee, for uses and purposes for the benefit of the beneficiary." It concluded that the will "does in fact indicate a contrary intention to an in[-]kind distribution at this time." The court further stated:

> The will in this instance shows the testator's intent to have the estate poured into a trust to be managed by the Trustee, and to apply the net income of the estate for the benefit of the beneficiary, with an initial distribution of up to $5,000 at age thirty, and the full amount of the trust to be distributed when the beneficiary turns thirty-five years old. . . . As a result, the testator's intent must be carried out and the Court declines the request to order an in[-]kind distribution in this instance, as it would be contrary to the clear intent of the testator.

> This outcome is also consistent with the terms of the settlement agreement previously reached under the stipulated Order of the Court filed on July 11, 2023, of which the Court also hereby takes judicial notice. Said Order was by agreement of the parties and authorized the Personal Representative the discretion to decide, after giving good faith consideration to, any in[-]kind distribution request. It is clear there is not an agreement of the parties with regard to an in[-]kind distribution[,] and the decision of the Personal Representative to not distribute assets in kind was within the discretion of the Personal Representative under the terms of the stipulated Order.

Knapp filed a notice of appeal on April 9, 2024. Loren filed a motion to dismiss Knapp's appeal on May 13 on the basis that Knapp failed to post a supersedeas bond with the clerk of the county court as required by Neb. Rev. Stat. § 30-1601 (Cum. Supp. 2024). We overruled Loren's motion to dismiss but directed the parties to brief the supersedeas bond issue on appeal.

ASSIGNMENTS OF ERROR

Knapp assigns, reordered, that the county court erred in (1) finding that Leon's will indicated a contrary intention to an in-kind distribution, but even if it did, the court nevertheless erred in refusing to grant an in-kind distribution; and (2) adopting and relying upon the July 11, 2023, stipulated order since it was inconsistent with § 30-24,104.

STANDARD OF REVIEW

An appellate court reviews probate cases for error appearing on the record made in the county court. *In re Guardianship of Patrick W.*, 316 Neb. 381, 4 N.W.3d 833 (2024). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

An appellate court, in reviewing a probate court judgment for errors appearing on the record, will not substitute its factual findings for those of the probate court where competent evidence supports those findings. *Id.*

Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court. *Id.*

ANALYSIS

SUPERSEDEAS BOND

We first address Loren's argument that Knapp's appeal should be dismissed for a lack of jurisdiction due to her failure to post a supersedeas bond.

The basic function of a supersedeas bond is to stay execution on a judgment during the pendency of an appeal. See *In re Estate of Sehi*, 17 Neb. App. 697, 772 N.W.2d 103 (2009). The requirement for filing a supersedeas bond in probate cases is codified in § 30-1601, which states, in relevant part:

(1) In all matters arising under the Nebraska Probate Code . . . appeals may be taken to the Court of Appeals in the same manner as an appeal from district court to the Court of Appeals.

(2) An appeal may be taken by any party and may also be taken by any person against whom the final judgment or final order may be made or who may be affected thereby.

(3) When the appeal is by someone other than a personal representative, conservator, trustee, guardian, guardian ad litem, or surrogate pursuant to the Health Care Surrogacy Act the appealing party shall, within thirty days after the entry of the judgment or final order complained of, deposit with the clerk of the county court a supersedeas bond or undertaking in such sum as the court shall direct, with at least one good and sufficient surety approved by the court, conditioned that the appellant will satisfy any judgment and

- 9 -

costs that may be adjudged against him or her, including costs under subsection (6) of this section, unless the court directs that no bond or undertaking need be deposited. If an appellant fails to comply with this subsection, the Court of Appeals on motion and notice may take such action, including dismissal of the appeal, as is just.

The authority to dismiss an appeal conferred by this statute is discretionary in nature in that it directs that a court "may" take such action "as is just." See *id.*; *In re Trust Created by Isvik*, 274 Neb. 525, 741 N.W.2d 638 (2007).

In *In re Trust Created by Isvik, supra*, the appellants initiated, but did not complete, the process of obtaining a supersedeas bond within the 30-day period required by § 30-1601. The bond was filed 46 days after the entry of judgment. The Nebraska Supreme Court concluded that dismissal was not warranted because there was "no indication that the late filing resulted in prejudice or delay." *In re Trust Created by Isvik*, 274 Neb. at 532, 741 N.W.2d at 644.

Further, in *In re Estate of Sehi, supra*, the appellants appealed from a district court's denial of their action contesting a decedent's will. The appellants did not file a supersedeas bond when appealing, and the personal representative filed a motion with this court to require the appellants to deposit a supersedeas bond of $500,000. This amount was the approximate value of the estate that had not been distributed due to the will contest and subsequent appeal. This court noted that the estate was composed of almost entirely real estate and that real estate was not liable to loss by destruction but could be subject to loss in value pending an appeal. It further stated that costs on appeal could include attorney fees and that a bond of $100,000 was sufficient to give full protection to the personal representative. Rather than dismiss the appeal for a lack of jurisdiction pursuant to § 30-1601, this court sustained the personal representative's motion and directed the appellant to file a bond within 14 days.

In the present case, Loren did not specifically request that Knapp post a supersedeas bond. We further observe that because Knapp is the sole beneficiary of the estate, allowing her to proceed on appeal without posting a supersedeas bond would not result in any prejudice. Under these circumstances, we conclude that dismissal would not be just. We therefore proceed to consider the merits of Knapp's appeal.

IN-KIND DISTRIBUTION

Section 30-24,104 states that "[u]nless a contrary intention is indicated by the will, the distributable assets of a decedent's estate shall be distributed in kind to the extent possible[.]" Knapp assigns that the county court erred in finding that Leon's will indicated a contrary intention to an in-kind distribution, but that even if it did, the court nevertheless erred in refusing to grant her an in-kind distribution of her father's estate. Loren argues that even disregarding the July 11, 2023, "stipulated order," the court correctly determined that the will gave the personal representative the authority to sell any and all property, and therefore, as the court found, the "'will does in fact indicate a contrary intention to an in[-]kind distribution.'" Brief for appellee at 12.

The county court relied on the following language in Leon's will to determine that it contained a contrary intention to an in-kind distribution: "Except as to property specifically disposed of herein, I hereby authorize my Personal Representative to sell (including the power to quiet title), lease, mortgage (beyond the tenure of his office), or cash in any and all property

belonging to my estate, of every nature and wherever situated . . . ." It concluded that because the will gave Loren the authority to sell any property, then the will "does in fact indicate a contrary intention to an in[-]kind distribution at this time." We disagree that this language creates a contrary intention to an in-kind distribution. Rather, this language grants a personal representative the authority to sell, not a mandate to sell. In fact, the attorney who drafted Leon's will testified that he uses the word "shall" when there is no question about a testator's intention and uses the words "is authorized" to give some discretion to a personal representative to act in accordance with statutes.

Furthermore, the language quoted above must be read in context with the entire paragraph II of the will. While it authorizes the personal representative to sell "any and all property belonging to my estate," the sentence does not end there. When reading the paragraph as a whole, it authorizes the personal representative "to sell . . . any and all property belonging to my estate . . . without an order of any court, upon such terms and conditions as to him seem best, *and for the purpose of paying debts or facilitating the division and distribution of my estate*, or for such other purposes as he may deem advisable[.]" (Emphasis supplied.) The authority to sell property is not without some limitation; rather, that authority is available "for the purpose of paying debts or facilitating the division and distribution of [Leon's] estate." And while that authority extends to "such other purposes as he may deem advisable," there is no other purpose when there is a single beneficiary than to pay off the liabilities of the estate and then hold in trust or distribute the remaining assets as directed by the will and testamentary trust. And in this case, where the sole beneficiary agreed to the sale of the rental property to cover any liabilities owed by the estate, there is no other purpose for selling all the assets that would be consistent with the personal representative's fiduciary duty in administering the estate.

Furthermore, while the parties, and the county court to some degree, primarily focused their analysis on the language in paragraph II of Leon's Will discussed above; we conclude that this case should have been resolved based on the language of the testamentary trust, which begins at paragraph V. The trust language specifically states that if Leon's beneficiary, which no one disagrees is solely Knapp, was 35 years of age at the time of his death, then "all of [his] property of every kind and nature and wherever situated" "shall" be given to Knapp, and no trust should be established.

However, if Knapp was under the age of 35 at the time of Leon's death, then "all of [Leon's] property of every kind and nature and wherever situated" is given to the trustee "in trust for the uses and purposes and under the terms and conditions, and with the powers and duties hereinafter stated." Those powers and duties included paying or applying the net income from the trust to or for Knapp's benefit, and for her "care, support, maintenance and education" until she is 30 years of age. However, if at the time of Leon's death, Knapp was at least 30 years old, which she was, then one of two things could happen. First, if the trust was valued at $5,000 or less, then the trustee was to immediately distribute its assets to Knapp, or to her descendants if she predeceased her father. But, if the trust had a value greater than $5,000, which it did, then the trustee "shall" distribute the full amount to Knapp if she was 35 years old; but if she was not yet 35, then the trustee "shall distribute one-half" to each beneficiary who is less than 35 years old. Further, the trustee "shall pay to any such beneficiary the remaining one-half of his share when he arrives at the age of thirty-five years." In the meantime, the trustee "shall" pay to Knapp the income

of that remaining one-half share. In other words, Knapp was entitled to immediately receive one-half the value of her father's assets upon his death since she was at least 30 years of age, with the remaining half to remain in trust and earning income for her benefit until she reached the age of 35. Upon reaching age 35, the trustee "shall pay" to her the "remaining one-half" of her share, implicitly indicating the termination of the trust upon her turning age 35.

Notably, at the hearing on May 9, 2023, when the attorneys for the parties orally set forth their understanding of the agreement to resolve each party's respective motions to be appointed as personal representative, Knapp's attorney made part of that agreement the fact that Knapp was requesting an in-kind distribution of the residence and its contents. After entry of the July 11 order, Knapp, then age 34, filed a "Formal Request for In-Kind Distribution," which alleged that she was entitled to distribution of one-half of her father's estate. She reiterated her request for an in-kind distribution of the residence and its contents. She specifically asked that the real and personal property at that address not be sold. While the residence and its contents may have amounted to slightly more than one-half the estate's assets, the fact that Knapp was entitled to an immediate partial distribution of her father's assets was not addressed by the county court at all.

In the county court's April 8, 2024, order, it correctly determined that Leon's intent was "to have the estate poured into trust to be managed by the Trustee." But it then erroneously concluded that there should be "an initial distribution of up to $5,000 at age thirty, and the full amount of the trust to be distributed when the beneficiary turns thirty-five years old." It then stated, "As a result, [Leon's] intent must be carried out and the Court declines the request to order an in[-]kind distribution in this instance, as it would be contrary to the clear intent of [Leon]." However, as already explained, the testamentary trust provided for one-half of Leon's assets to be distributed to Knapp if she was between the ages of 30 and 35 and the estate's value was greater than $5,000, so an in-kind distribution requested by Knapp at age 34 was not contrary to her father's intent as expressed in the testamentary trust.

Under the testamentary trust, Leon was directed to "hold, manage, lease, care for and protect said trust estate and collect the income therefrom, all in accordance with its best judgment and discretion." The testamentary trust allowed the trustee, "at its discretion," to "hold any or all property . . . or sell the same, and is also . . . authorized to invest such part of such estate as may from time to time be converted into cash in such manner as in its discretion it may deem proper and suitable and for the best interests of the trust estate." There is no language in the testamentary trust that requires the trustee to sell all the assets being held in trust for the benefit of the beneficiary. Instead, Loren was to "hold, manage, lease, care for and protect said trust estate and collect the income therefrom." And while it did authorize him to sell assets, any such conversion to cash was to be done "in such manner as in its discretion it may deem proper and suitable and for the best interests of the trust estate."

A testamentary trust is "created by devising or bequeathing property in trust in a will as such terms are used in the Nebraska Probate Code." *Donna G. v. Nebraska Dept. of Health & Human Servs.*, 301 Neb. 838, 846-47, 920 N.W.2d 668, 675 (2018). A trust creates a fiduciary relationship in which one person holds a property interest subject to an equitable obligation to keep or use that interest for the benefit of another. *In re Estate of Stuchlik*, 289 Neb. 673, 857 N.W.2d 57 (2014) (dispute involving assets held in testamentary trust established by last will and testament of decedent). A trustee has the duty to administer the trust in good faith, in accordance with its

terms and purposes and the interests of the beneficiaries, and in accordance with the Nebraska Uniform Trust Code. *Id*. The Nebraska Uniform Trust Code, in turn, states that trustees owe the beneficiaries of a trust duties that include loyalty, impartiality, prudent administration, protection of trust property, proper recordkeeping, and informing and reporting. *Id*. The duty of loyalty requires a trustee to administer the trust solely in the interests of the beneficiaries. *Id*. Impartiality means that a trustee's treatment of beneficiaries or conduct in administering a trust is not to be influenced by the trustee's personal favoritism or animosity toward individual beneficiaries. *Id*.

Loren was required to administer the trust solely in the interest of Knapp, who was 33 years old when her father died. She was immediately entitled to one-half of her father's assets, with the remaining half placed into trust for her benefit until she reached the age of 35, at which time the trustee had an obligation to distribute the remaining half of the assets held in trust for Knapp's benefit, and thus implicitly terminate the trust. Knapp's request for an in-kind distribution of the residence and its contents was consistent with the terms of her father's testamentary trust and was consistent with § 30-24,104, which provides that "[u]nless a contrary intention is indicated by the will, the distributable assets of a decedent's estate *shall be distributed in kind* to the extent possible[.]" (Emphasis supplied.) The county court erred in failing to consider the in-kind distribution request under the terms of the testamentary trust as described above.

We therefore find that the county court erred in interpreting Leon's will to have a contrary intention under § 30-24,104. As such, we reverse its April 8, 2024, order denying Knapp's petition for an in-kind distribution of the residence and its contents. We next address the parties' arguments related to the stipulated order.

STIPULATED ORDER

Because the county court's April 8, 2024, order also referred to its "stipulated" order entered on July 11, 2023, we address whether that order had any impact on the terms of Leon's will and testamentary trust as discussed above. As another reason for denying Knapp's request for an in-kind distribution, the county court stated:

> This outcome is also consistent with the terms of the settlement agreement previously reached under the stipulated Order of the Court filed on July 11, 2023, of which the Court also hereby takes judicial notice. Said Order was by agreement of the parties and authorized the Personal Representative the discretion to decide, after giving good faith consideration to, any in[-]kind distribution request. It is clear there is not an agreement of the parties with regard to an in[-]kind distribution and the decision of the Personal Representative to not distribute assets in kind was within the discretion of the Personal Representative under the terms of the stipulated Order.

Knapp contends that the county court erred in approving the parties' stipulation and by "relying" on it in denying her petition for an in-kind distribution. Brief for appellant at 17. Specifically, she contends that the stipulation is inconsistent with § 30-24,104 because it gave Loren "ultimate discretion over in[-]kind distributions." Brief for appellant at 14. Loren argues that the court's decision was not inconsistent with Nebraska law because parties "are free to make stipulations that govern their rights, and such stipulations will be respected and enforced by courts so long as the agreement is not contrary to public policy or good morals." Brief for appellee at 8.

- 13 -

We initially observe that agreements to modify testamentary trusts were generally not allowed under the common-law rule, but that Neb. Rev. Stat. § 30-24,123 and § 30-24,124 (Reissue 2016) now "expressly allow for testamentary trusts to be affected by compromises." *Donna G. v. Nebraska Dept. of Health & Human Servs.*, 301 Neb. at 849, 920 N.W.2d at 676. While § 30-24,123 provides for a "compromise of any controversy as to the admission to probate of any instrument offered for formal probate," § 30-24,124 requires such a compromise to be "set forth in an agreement in writing which shall be executed by all competent persons . . . having beneficial interests . . . which will or may be affected by the compromise."

Notably in the present case, there is no agreement set forth in writing and executed by Knapp and Loren contained in the record on appeal. However, there is authority for departure from the statutory requirement for a written document signed by the parties when a stipulation is dictated into the record by an attorney, the stipulation is expressly agreed to by the parties, and the stipulation is not contrary to good morals or sound public policy. See *In re Estate of Mithofer*, 243 Neb. 722, 502 N.W.2d 454 (1993) (stipulation regarding who should serve as co-personal representatives and how estate assets were to be distributed found enforceable despite language in § 30-24,124 requiring agreement in writing signed by parties since stipulation was dictated into record and expressly agreed to by parties). In the present case, the attorneys for the parties did not dictate a specific agreement reached by the parties into the record but they did discuss the general nature of their agreement as set forth earlier in the opinion. The parties affirmed on the record their agreement with what counsel had presented, and we therefore consider the parties' arguments related to the stipulation.

The primary question is whether the parties' stipulation, as set forth in the July 11, 2023, order, affected the terms of Leon's will and testamentary trust, as we have discussed above. We conclude that it does not. Rather, the stipulation only confirmed the parties' agreement that Loren would proceed as personal representative, and that Knapp would perform various tasks to minimize expenses for the estate. The agreement also reflected Knapp's willingness to sell the rental property and very clearly established her desire to receive an in-kind distribution of the residence and its contents. There was nothing in the agreement verbally entered into the record about the parties agreeing to "take steps to sell all" of Leon's property at fair market value, although such language was used in the county court's order incorporating the parties' agreement and which the parties' attorneys signed. At the hearing, however, Knapp agreed to the verbal stipulation presented by the attorneys; she did not agree, nor did she personally sign the proposed order submitted by Loren's attorney that appeared to somewhat alter the terms set forth on the record at the hearing. It is puzzling why such language was included in the July 11 order since it was made very clear at the hearing on May 9, that Knapp agreed to sell the rental property for fair market value but specifically requested an in-kind distribution of the residence and its contents. Further, Loren agreed that he "shall give good faith consideration" to that request. Notably, while the county court referenced the requirement for Loren to give good faith consideration to any in-kind distribution request made by Knapp, the court did not explain how Loren had complied with that requirement.

Even if we were to find that the July 11, 2023, order modified the terms of the will and trust, Loren was not relieved of his duty of loyalty to administer the trust solely in Knapp's interests as sole beneficiary. Therefore, the July 11 order has no bearing on Knapp's entitlement to her

request to receive the residence and its contents in kind. Knapp made her interests clear by requesting an in-kind distribution of one of the two real estate properties that were supposed to be held in trust for her. While Loren was provided discretion in the course of administering the will and testamentary trust, that discretion is nevertheless subject to his duties of loyalty, impartiality, prudent administration, protection of trust property, proper recordkeeping, and informing and reporting. See *In re Estate of Stuchlik*, 289 Neb. 673, 857 N.W.2d 57 (2014).

Further, at no time did Loren ever provide any good faith explanation for why the residential property and its contents could not be distributed in kind to Knapp. Under the terms of the stipulation, he was required to do so. Under his duty as a trustee, he was to administer the trust solely in the interests of Knapp, the sole beneficiary. He has failed to comply with his obligations under both the stipulation and the testamentary trust.

## CONCLUSION

For the foregoing reasons, we reverse the county court's April 8, 2024, order denying Knapp's petition for an in-kind distribution of the residence and its contents and remand for entry of an order requiring the same.

REVERSED AND REMANDED WITH DIRECTIONS.